**FREEMAN v. DEPRESSION OIL CO., Inc.**
No. 4939.

Court of Appeal of Louisiana.
Second Circuit.

Feb. 5, 1935.

L. Percy Garrot, of Shreveport, for appellant.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, defendant, and O. J. Rowe own what is referred to in the pleadings as the "Warnus Peters" oil, gas, and mineral lease, covering 28 acres in section 10, township 7 north, range 11 west, Sabine parish, La., in the following proportions: Plaintiff, five-eighths; defendant, two-eighths; Rowe, one-eighth.

Prior to the time the ownership of the lease became thus vested, in fact when owned in its entirety by defendant, a well was put down on it, which was pronounced "dry." Thereafter, defendant entered into a contract with one W. S. Wilson whereby an undivided three-fourths' interest in said lease was assigned to Wilson on condition that he would, " * * * cause the well which has heretofore been drilled on said described lease in search of oil to be treated with the acid process which is now being used extensively in the area of said lease for the purpose of increasing the oil production, and to that end said assignee agrees and obligates himself, at his own expense and without any cost whatsoever to the assignor, to purchase such equipment, and equip said well with the same, as may be necessary to assure maximum benefits from said acid process treatment, all of which said assignee agrees and obligates himself to do and perform within thirty days. * * *"

This test was to be made in 30 days. Wilson then assigned one-eighth interest in the lease, subject to his contract with defendant, relative to making the acid test of the well, to O. J. Rowe, and a few days thereafter he assigned to plaintiff the remaining five-eighths interest in the lease in consideration of an amount in cash and the agreement on the part of plaintiff to carry out and fully discharge the obligations imposed upon and assumed by Wilson in his contract with defendant. Plaintiff made the acid test at his own expense. The well came in as a pumper, with a daily production of over 100 barrels, but its output gradually declined until, presumably, production has ceased. The oil was sold to the Standard Oil Company and monthly remittances were made by it therefor to the three owners in proportion to their ownership, and Rowe and defendant, as regularly,

sent their checks for like amounts to plaintiff to be applied by him against the expense outlay made by him in equipping the well for production and operating expenses thereafter. This practice was followed by defendant until, by special agreement with plaintiff, $50 per month was retained by it from amounts paid by the Standard Oil Company, and the balance paid over to plaintiff. This monthly deduction was used in operating defendant's office affairs and continued for ten months, and thereafter, when the payments were less than $50, the entire amount was retained. Three payments less than $50 were made. The total retained was $627.39. Total receipts of defendant from the sale of its part of the oil, after deducting the said amounts monthly retained by it, failed to repay to plaintiff by $1,203.63 defendant's alleged proportion of the expense incurred by plaintiff in the purchase and installing of the equipment necessary to bring the well in and for operating it thereafter. Plaintiff seeks to recover judgment against defendant for this amount. He alleges, inter alia: "4. That since the acquisition by petitioner of his interest in said lease he has, with the consent and agreement of its co-owners, operated the well located upon the lands described, producing oil therefrom for the joint benefit of the co-owners according to their interests and with the understanding that he would be reimbursed the cost of operation by the co-owners in proportion to their interests in the lease described."

Therefore, it will be seen that plaintiff's suit and his alleged right to recover are predicated upon an alleged agreement between himself and defendant.

Defendant admits ownership of a one-fourth interest in said well, and that oil was produced therefrom by plaintiff for defendant's benefit, and admits that it paid to plaintiff $1,071.90, as alleged by him, on the expense account sued on, but in all other material respects denies the allegations of the petition. He prays that plaintiff's suit and demands be rejected.

From a judgment for plaintiff, as prayed for, defendant appealed.

Defendant's contention is that there was no contract or obligation on its part to repay to plaintiff any part of the expense incurred by him in connection with the bringing in or operation of the said well beyond the price of sale of its part of the oil. In other words, if production was sufficient to repay plaintiff, good and well; otherwise, he would have to absorb the difference; that beyond this there was no personal obligation on its part. The correctness of the amount of debit charges in the account sued on is not seriously questioned. However, defendant does challenge the right of plaintiff to charge to it any part of the expenses incurred in the purchase and installing of the equipment needful to secure production, following the acid test.

Before plaintiff incurred any expense for equipment necessary to bring the well in, after the acid test had been made and indications for oil were favorable, he and Mr. W. H. Rowe, defendant's president, discussed the matter, and the following is plaintiff's version of Rowe's position: "Q. Was he interested in having you equip it? A. Yes, he came to me, told me they had no money, I would have to put up their part of the equipment and I could take it out of the runs every month."

He says further: "We had no agreement except the agreement between Mr. Rowe and myself. I was to put the money up, they were to pay me back out of the runs as they came in every month."

And again he says: "I agreed with Mr. Rowe that I was going to put the money up for the Depression Oil Company and that Company was going to pay me back, they were going to pay me back the best way they could."

And later on, he testified:

"Q. Did they not agree, did he not agree to pay you back only out of the runs? A. No, he just agreed to pay me—

"Q. Did he agree he pay you out of the pocket of the Depression Oil Company? A. I don't know how he was going to pay, Mr. Garrot.

"Q. If there were not sufficient runs to pay for the expenses, did he agree to make up the difference out of his own pocket? A. There was no specific agreement as to that—

"Q. There was no agreement as to that? A. No, I naturally assumed if they could not pay one way they would have to pay the other.

"Q. But there was no agreement to that effect? A. Well, I didn't see an agreement would be necessary."

This testimony, to say the least of it, is extremely equivocal and susceptible of varied interpretations. Once he says defendant was to repay him "out of the runs," and later, he says that Rowe promised to pay him back the best way he could, and lastly, he says there was no agreement at all as to how he would

be repaid any part of the account not extinguished by sale of the oil.

For some reason not fully explained, Mr. W. H. Rowe's testimony was not taken. He, at the time of trial, was living in Jackson, Miss., but occasionally visited the city of Shreveport. He was there a few days prior to trial of the case. No other officer of defendant appears to have had anything to do with the matter whatever. Not one of them testified in the case. The testimony of plaintiff touching his and Rowe's understanding as to the expense of developing and operating the well is all we have on the subject. It was then thought that the oil production would easily take care of all these expenses.

■■ If Rowe, as defendant's president, undertook to personally bind it for any part of the expenses represented in the account sued on, he exceeded his authority, so far as the record discloses. It would take special delegation of power for a president to be within his authority to enter into such a contract. It was of a very hazardous nature. The only action on the part of defendant which indicates ratification by it of Rowe's agreement with plaintiff, whatever its terms were, lies in the fact that it did pay over to him the monthly payments made to it for purchase of its part of the oil runs. However, this course of conduct is not at all conclusive on the question. It was the course to follow under plaintiff's own contention, as well as under the contention of defendant. The money had to be paid over to plaintiff in either instance. Unless defendant agreed to repay to plaintiff its proportion of the expenses entailed by bringing in and operating the well, or has ratified such agreement, if made by its president for it, most certainly it cannot be held for such expenses beyond what it is willing to pay.

■ Plaintiff sued on an alleged agreement. The burden of proving its terms rested upon him. He has not done this to that degree of certainty that would justify holding defendant responsible to him for all the balance sued for; and we are clear in the opinion that defendant has not ratified the alleged agreement to the extent that it has committed itself to personal responsibility for any part of such expenses in excess of the price of its part of the oil runs. Plaintiff's own testimony makes the terms of the alleged contract uncertain. Defendant's payments to him may be construed to have ratified the contract, as understood by it, rather than as a ratification of the agreement as contended for by plaintiff.

Plaintiff contends that since the lease was developed for the joint benefit of all co-owners, and production was secured, that defendant, by implied or quasi contract, is legally bound to pay its proportionate part of the expense properly incurred in attaining these results, and cites in support of his position Martel v. Jennings-Heywood Oil Syndicate, 114 La. 351, 38 So. 253; Allies Oil Co. v. Ayers, 152 La. 19, 92 So. 720.

■ These two cases hold that where one colessee, on his own initiative, or because the other colessee will not, or for financial or other reasons, cannot join with him, develops a lease and secures profitable production, the noncontributing lessee who claims his proportionate part of the oil thus produced is bound to the reimbursement of a like proportion of the expenses incurred to secure the production. In each of these cases production was very valuable. It greatly exceeded the expense account incident thereto. The principle upheld in these two cases is but the recognition of a cardinal rule of equity. We have been cited to no case, and know of none, which holds that the noncontributing colessee may be held, without his consent, for a proportionate part of expense incurred in "wild cat" ventures on a lease, or for any part of expense incurred in bringing in a well whose production does not, when sold, repay all such expenses. To hold that, regardless of the outcome of tests for oil or gas by one colessee, the other colessee may be held for a proportionate part of the expense incurred in the unsuccessful venture, would be tantamount to placing the less opulent or less informed colessee wholly at the mercy of the better situated associate. The interest of the noncontributing lessee could thereby be entirely destroyed or absorbed by the more fortunate one; financial ruin or forced sacrifice of his property rights would often result. Thornton on Gas and Oil (4th Ed.) vol. 1, p. 793, par. 321.

However, we think plaintiff entitled to recover the amount he consented for defendant to retain from payments to it for oil. This money belonged to plaintiff. If he had not allowed defendant to retain it, the losses from his experience with the well would have been that much less. He would be now suing defendant for that much less.

■ Defendant makes the point that under the Wilson contract, assumed by plaintiff, the cost of buying and installing the equipment necessary to bring the well in would fall entirely on plaintiff. We do not think the con-

tract, all of its parts considered, susceptible of this interpretation. Defendant itself has not so construed it. The payments made by it to plaintiff on the account greatly exceed its proportion of operating expenses incident to production after the well began to produce. No error in this respect is alleged or suggested.

For the reasons herein assigned, the judgment appealed from is amended by reducing the amount thereof to $627.39, and, as thus amended, said judgment is affirmed, with costs.