442 So.2d 610 (1983)
William G. CORBELLO, et al.
v.
R.T. SUTTON, Commissioner of Conservation, State of Louisiana.
No. 83 CA 0150.
Court of Appeal of Louisiana, First Circuit.
November 22, 1983.
*611 Thomas Bergstedt, Lake Charles, for plaintiffs-appellants William Garland Corbello, Sheila Corbello, Wilton Corbello and Ruby Corbello.
John M. McCollam, New Orleans, for intervenor-appellee Toce Oil Co.
Viel David Devillier, Eunice, for defendant-appellee R.T. Sutton, Com'r of Conservation.
Before COVINGTON, COLE and SAVOIE, JJ.
SAVOIE, Judge.
Plaintiffs, William G. Corbello (Corbello) and others, owners of 120 acres of land and minerals included in Unit 252-A Calcasieu Parish (252-A), created by the Commissioner of Conservation, State of Louisiana (Commissioner), effective September 1, 1954, for the Pujol Sand in the Gillis-Bayou English Field, Calcasieu Parish, nominated the Pujol Unit No. 1 (Pujol 1) seek review of the trial court's determination that Commissioner Order entitled "Supplement to Order 252-A" (Supplemental Order), which dissolved Pujol 1 effective April 21, 1978, *612 and Commissioner Order 252-A-1 rendered February 11, 1981, effective December 1, 1981, recreating 252-A with the exception of a large portion of plaintiffs' property are valid. Review is sought pursuant to L.S. A.R.S. 49:964[1] and, alternatively, L.S.A.R.S. 30:12.[2]
In 1954, Unit 252-A was created, initially producing in paying quantities. Eventually, production declined and the well was abandoned in 1963. In the late 1970's, Lamson/Onshore and Toce Oil Company (Lamson-Toce) sought a block of leases in the abandoned unit. In doing so, they attempted to lease Corbello's 120 acres in Unit 252-A but were unsuccessful due to his insistence that an additional 80 acres of his personally owned property also be leased.
After acquiring leases from the original Unit 252-A land-owners, save Corbello, Lamson-Toce made application to the Commissioner for dissolution of Unit 252-A pursuant to L.S.A.-R.S. 30:9.1 B.[3] The dissolution *613 was granted by Supplemental Order 252-A, made effective April 21, 1978. Such Order was recorded in the Conveyance Records of Calcasieu Parish on May 1, 1978, pursuant to L.S.A.-R.S. 30:9.1 E.[4]
When Lamson-Toce brought in a successful well, denominated the Toce-Albert Pujol Well No. 1 (Toce 1), in March, 1980, the previously secured leases were then combined into a new voluntary unit following the land lines leased by Lamson-Toce. Toce 1 is located approximately 600 feet from the property of Corbello.
Upon this discovery, Corbello, who had previously leased his lands to Daniel Oil Company (Daniel), called upon Daniel, as per their lease agreement, to request a public hearing by the Commissioner. Corbello wanted the Commissioner to consider the necessity and/or propriety of forming a compulsory Unit for Toce 1. Such hearing was held on December 12, 1980, after which the Commissioner issued Order 252-A-1, dated February 11, 1981, effective December 12, 1980. Such Order created a Unit which did not conform to the configuration urged by either Lamson-Toce or Daniel but which included four acres of Corbello's acreage. Subsequently, this Order was amended on March 2, 1981, but with no substantive changes. Plaintiffs filed suit on August 28, 1981.
Defendants filed numerous exceptions, all of which have been disposed of by prior judgments, save the exception of laches. This exception was referred to the merits. Trial was had on both the exception and plaintiffs' constitutional violation of due process claim. After trial on both of these issues, the trial court determined that plaintiffs' claims were barred by laches and, for this reason, did not determine the constitutional issues.
Plaintiffs assert that the trial court erred in (1) holding that this suit was barred by the doctrine of laches, and (2) not addressing the merits of the plaintiffs' constitutional claim.

LACHES
We find that the excellent opinion of the trial court amply addresses plaintiffs' first assignment of error. We adopt in toto the trial court's judgment, a copy of which is attached hereto, labeled EXHIBIT 1. Accordingly, we find plaintiffs' first assignment of error to be without merit.

DUE PROCESS
Plaintiffs assert that they are entitled to judgment on the merits and ask that Order No. 252-A-1 be set aside. This assignment of error has a two-prong attack. First, plaintiffs contend that the Supplemental Order was improvidently issued by failing to give proper notice. Second, they contend that L.S.A.-R.S. 30:9.1 violates the principle of counter drainage and, as such, allows the taking of property without due process or just compensation in violation of both the state and federal constitutions.
Plaintiffs' first assertion that they were not given proper notice of the Commissioner's intent to dissolve the original Unit is unsupported by the record. The record clearly indicates, as noted in the trial court's written reasons for judgment, that plaintiffs had both actual and constructive notice of dissolution of the Unit. See EXHIBIT 1. As such, their contention of inadequate notice is totally without merit.
Secondly, they assert that L.S.A.-R.S. 30:9 mandates that the principle of counter drainage is constitutionally required. We agree. However, simply put, plaintiffs contend that the Commissioner should not *614 and cannot construe L.S.A.-R.S. 30:9.1 F[5] as giving him the authority to create new units from a previously unitized sand utilizing the current productive limits of the reservoir as the new unit boundaries. Plaintiffs contend this violates due process.
It is well settled that the initial requirement in any due process claim is that the claimant show the existence of some property or liberty interests which have been adversely affected. Delta Bank & Trust Company v. Lassiter, 383 So.2d 330 (La.1980). L.S.A.-R.S. 31:6 expressly articulates that the ownership of land does not include the ownership of oil, gas and other fugacious minerals occurring in their natural state in a subsurface reservoir. Accordingly, plaintiffs have no property interest in the alleged minerals until they are captured. Once captured, the minerals are susceptible of private ownership and provide a cause of action if they are lost. To prevent an abuse of the rule of capture and wasteful drilling, Louisiana adopted the concept of forced or compulsory pooling. See L.S.A.-R.S. 30:1 et seq. and, in particular, L.S.A.-R.S. 30:9 B. This concept requires that all persons in the "pool" of gas, oil or other fugacious minerals share in its production.
However, in the instant case, geological surveys submitted in the record fail to substantiate that plaintiffs' property is in the "pool" being drained by the Toce 1 well. Accordingly, plaintiffs' due process claim is totally without merit. Further, any contention that plaintiffs have not had their "day in court" as required by due process is also without merit.
The record clearly shows that plaintiffs challenged the dissolution of Unit 252-A in a hearing before the Commissioner in December, 1980. They further asked that the newly formed unit be modified or reformed to include plaintiffs' property. This same evidence was presented to the trial court in the trial de novo. We find that the plaintiffs have not been denied due process.
For the above and foregoing reasons, judgment of the trial court is hereby affirmed. Plaintiffs are to pay all costs.
AFFIRMED.

EXHIBIT 1

JUDGMENT
William G. Corbello (Corbello) and others, owners of 120 acres of land and minerals included in Unit 252-A Calcasieu Parish, (252-A), created by the Commissioner of Conservation, State of Louisiana, (Commissioner), effective September 1, 1954, for the Pujol Sand in the Gillis-Bayou English Field, Calcasieu Parish, denominated the Pujol Unit No. 1 (Pujol 1), bring this action for review of Commissioner Order entitled "Supplement to Order 252-A" (Supplemental Order), which dissolved Pujol 1 effective April 21, 1978, and also for review of Commissioner Order 252-A-1 rendered February 11, 1981, effective December 1, 1980, recreating 252-A by deleting therefrom all except a small fraction of plaintiffs' holdings. Review is sought pursuant to LSA-R.S. 49:964 and, alternatively LSA-R.S. 30:12.
Defendants filed numerous exceptions including prescription and laches all of which, except laches, have been disposed of by prior judgments rendered herein. In accord with the jurisprudence the court referred the plea of laches to the merits. After trial, the matter is now before the court on the plea of laches and the merits.

FACTUAL BACKGROUND
As initially constituted in 1954, 252-A included 120 acres belonging to plaintiffs. The unit well produced in paying quantities for a time but production declined and the unit well was abandoned by its operator Chevron, in 1963. The unit continued in existence and in 1979 plaintiff William G. Corbello and his spouse purchased all outstanding surface rights and most of the outstanding mineral rights in the Corbello 120 acres in Unit 252-A. The purchases were made pursuant to formal title opinion *615 based on examination of the public records of Calcasieu Parish.
In the late 1970's, Lamson/Onshore and Toce Oil Company (Lamson-Toce) began accumulation of a block of leases in the abandoned unit. Lamson-Toce attempted to lease the Corbello 120 acres in the old unit but was unsuccessful because Corbello insisted an additional 80 acres of his personally owned property be also leased. Corbello then leased his lands to Daniel Oil Company (Daniel).
After acquiring leases from owners of all lands in original Unit 252-A, except Corbello, Lamson-Toce made application to the Commissioner for dissolution of 252-A pursuant to LSA-R.S. 30:9.1 (Act 671 of 1975). The requested dissolution was granted by the Commissioner by Supplemental Order 252-A, made effective April 21, 1978. Pursuant to LSA-R.S. 30:9.1 E, Supplemental Order 252-A was recorded in the Conveyance Records of Calcasieu Parish on May 1, 1978.
In March, 1980, Lamson-Toce brought in a successful well which was denominated the Toce-Albert Pujol Well No. 1 (Toce 1). Lamson-Toce then combined its leases into a new voluntary unit which followed the lines of the lands leased by Lamson-Toce. The well is located approximately 600 feet from the property of Corbello.
Upon successful completion of Toce 1, Corbello's lessee, Daniel, requested the Commissioner to hold a public hearing to consider the necessity and/or propriety of forming a compulsory unit for Toce-1. On December 12, 1980, the Commissioner held a hearing to consider a unitization proposed by Daniel, which proposal was opposed by Lamson-Toce. After hearing, the Commissioner issued Order 252-A-1, dated February 11, 1981, effective December 12, 1980, creating a unit which did not conform to the configuration urged by either Lamson-Toce or Daniel. In effect the Commissioner recreated 252-A excluding therefrom all but four of Corbello's acreage lying along the northern boundary of the unit. On March 2, 1981, the Commissioner amended 252-A-1 but made no substantive changes therein. The amendment merely corrected the legend regarding the scale of the map on which the unit was designated and an inadvertent error in designating the parish in which the properties are located.
Plaintiffs filed this action August 28, 1981.

THE ISSUES
Basically this action tests and questions the Commissioner's interpretation, application and administration of LSA-R.S. 30:9.1, enacted by Act 671 of 1975, effective February 4, 1976. The statute provides for the expeditious termination of production units, as follows:
§ 9.1 Termination of units; conditions; procedure; Issuance or orders
A. Any unit or units established pursuant to the authority contained in this Chapter, shall unless sooner terminated, extended or otherwise modified by order of the commissioner, remain in full force and effect so long as:
(1) a well is producing from the pool for which the unit or units were established;
(2) a well is completed in the pool for which the unit or units were established and, although not producing, has been proved to be capable of producing;
(3) drilling, reworking, recompletion, plugging back or deepening operations are being conducted on a well to secure or restore production from the pool for which the unit or units were established; or
B. If a period of one year and ninety days elapses without the occurrence of any of the conditions specified in Paragraphs (1), (2), or (3), of Subsection A of this Section, upon application being made therefor, the commissioner may, by order issued after ten days legal notice, and without the necessity of a public hearing in the absence of objection, terminate all units within the pool.
C. The commissioner shall prescribe, issue, amend, and rescind such orders, rules and regulations as he may find *616 necessary or appropriate to carry out the provisions of this Section. Among other things, such orders, rules and regulations shall prescribe the form and substance of the application for unit termination, and all statements, declarations, and supporting evidence to be filed therewith.
D. The provisions of this Section are intended to and shall affect presently existing units; however, in those instances where more than one year and ninety days have elapsed prior to the effective date of this Section without any of the conditions specified in Paragraphs (1), (2), or (3) of Subsection A of this Section having occurred, such unit or units shall not be subject to termination hereunder until an additional period of ninety days has elapsed after the effective date of this Section without any of the said conditions having occurred.
E. Any order issued pursuant to this Section shall be filed for record as provided in Section 11.1 of this Title.
F. Any future wells completed within the boundaries of any unit or units terminated pursuant to this Section shall, upon a new unit application being made to the commissioner, be entitled to a unit hearing as otherwise provided for by law as fully as though the original unit or units had never been created, and any such new unit or units shall not be limited in any way by the prior hearing or pre-existing unit or units.
G. No provision of this Section shall be construed so as to in any way limit the authority otherwise granted to the commissioner to terminate, extend, or otherwise granted to the commissioner to terminate, extend, or otherwise modify any unit or units. Added by Acts 1975, No. 671, § 1.
Plaintiffs concede that 30:9.1 can be constitutionally interpreted, administered and applied if properly supplemented by Commissioner Order. It is contended, however, that 29-L and the Commissioner's administration thereof does not fulfill the mandate of 30:9.1(C) that ten days legal notice of application to dissolve shall be given. Plaintiffs claim this deficiency resulted in their not having been given notice of the application to dissolve. They argue, consequently they were deprived of their property without due process of law contrary to La. Const.1974, Article 1, Section 2.
Plaintiff next contend a denial of due process resulted from the Commissioner's granting an allowable for Toce 1 from a voluntary unit without a prior hearing. It is argued that 30:9.1 contemplates a hearing to determine boundaries of new units and 29-L fails to prescribe adequate regulatory provisions and methods by which units are re-created upon production being restored from the pool in the terminated unit.
Lastly, plaintiffs contend that 29-L as interpreted and enforced by 252-A-1 deprives them of their property without just compensation contrary to La. Const.1974, Article 1, Section 4, in that their property which admittedly contributed to the initial unit is denied participation in the re-established unit. It is argued that, as a matter of law, plaintiffs' lands should be included in the new unit absent a present showing that their lands did not contribute to past production and therefore should not have been included in the original unit.

LACHES
Our jurisprudence is well established to the effect that a plea of laches requires proof on the part of the pleader of two essential elements. First it must be shown that there was an unreasonable delay on the part of plaintiff in filing the action. Second, the pleader must establish that the delay has resulted or will result in harm, loss or detriment to a defendant or third party. Jordan v. Sutton, 401 So.2d 389 (La.App. 1st Cir.1981).
Delay alone is insufficient to support a plea of laches. The rule is stated in Triangle Oil Co. v. City of New Orleans, 5 So.2d 558 (Orleans App.1942), as follows:
"In constituting a defense, the doctrine of lack of viligance is based on, and in *617 part resides in, the injury which might be occasioned, the injustice that might result from the enforcement of long neglected rights, the difficulty and in many instances the impossibility, of ascertaining the truth of matters in controversy and doing justice between the parties, and in part on grounds of public policy, its aim being the discouragement, for the peace and repose of society, of stale and antiquated demands. It is equally well recognized, however, that the doctrine cannot be invoked to defeat justice and will be applied only where the enforcement of the right asserted would work injustice."
Lamson-Toce began drilling its well on November 11, 1978; it was completed January 11, 1979, and began production of 2MCF on March 28, 1979. Drilling costs were incurred in the sum of $1,200,000.00. In 1980, Lamson-Toce drilled a second well in the recreated unit at a cost of $660,000.00 which well was nonproductive. Additionally, Lamson-Toce expended $37,500.00 for a survey, abstracts, title examinations and curative work in conjunction with its voluntary unit. Also relying on the assumed valid dissolution of 252-A, Lamson-Toce paid royalties and working interests and incurred hereinafter itemized expenses.
LSA-R.S. 30:9.1, Paragraph B authorizes the Commissioner to dissolve a unit without a hearing after ten days legal notice having been given and no opposition having been made. Order 29-L-1 c, requires that a list of interested owners and represented parties to whom notice has been sent shall accompany the application to dissolve. Paragraph 5 of 29-L defines interested owner as one known to applicant after diligent search.
Corbello denies receipt of notice of application to dissolve 252-A. The list of owners submitted with the application to dissolve was prepared by Larry Blanchard, a representative of Lamson-Toce. Blanchard admits he compiled the list by reference to the Commissioner's file on the hearing when the original unit was created. The file contained two lists, one dated 1953, the other 1963. Blanchard combined the two lists, eliminated duplications and thus produced a composite list. He supplemented the list with names obtained from his efforts to lease properties in the subsequently created unit prior to making the application for dissolution. It is conceded that Corbello's name was not on the list of interested parties to whom notice of the application to dissolve was sent.
Although the record is clear that Corbello did not receive official notice of the application to dissolve 252-A, the record preponderates heavily in favor of the conclusion that he had actual notice of the application within a relatively short time after the application was filed.
Corbello was most knowledgeable in matters involving oil and gas. His father owned mineral interests which Corbello inherited in part. Corbello had numerous mineral transactions of his own and, in addition, supervised the family's holdings following the father's death in 1968. Corbello's father, F. Jefferson Corbello, owned an interest in 252-A. Notice of the application for dissolution was mailed to the elder Corbello at his then address. At this time Corbello lived next door to his father and shared the same mailbox on a rural route. Corbello also acknowledged that following his father's demise, his mother consulted him regularly concerning family business matters. Four members of the Corbello family, including Wilton Corbello, received notices of the application for dissolution. Wilton Corbello testified that in matters concerning the family property he consulted with F. Jefferson Corbello while he was alive and after his death he consulted with plaintiff, William G. Corbello. Order 252-A was duly recorded in the Conveyance Records of Calcasieu Parish on May 1, 1978.
In June, 1980, Corbello contacted Daniel and negotiated a lease of his land which provided for a 20% royalty plus a 20% override for Corbello. As part of the agreement, Daniel obligated itself to file proceedings with the commissioner to include *618 Corbello's lands in a unit to be served by Toce-Pujol-1. Corbello acknowledges he did not deem it advisable to personally file the application because he feared having to pay his proportionate part of production costs if he were successful; while Daniel, as lessee, would not run such a risk.
The agreement that Daniel would file application to have Corbello's lands included in a unit to be served by the Toce-Pujol-1 Well, rather than bring action against the Commissioner was based on Daniel's reluctance to sue the Commissioner directly. Daniel's agents and attorneys were loath to sue the Commissioner for fear that such action would prejudice the Commissioner in future actions by Daniel before the Commissioner.
In September, 1980, Daniel, as Corbello's lessee, made application to have the Corbello lands included in a unit to be served by the Toce-Pujol-1 Well. Pursuant to applicable statutory requirements, a pre-application conference was scheduled and held by Daniel in Lafayette, Louisiana, on October 8, 1980, to discuss Daniel's proposal. Prior to and at the conference, attended by Corbello, Daniel's representatives discussed and considered the possibility of proceeding with its unit application before seeking annulment of Supplemental Order 252-A. Later, on October 13, 1980, Daniel requested a public hearing on its proposed unit application, which hearing was scheduled by the Commissioner for December 18, 1980.
On December 1, 1980 Lamson-Toce duly notified all interested parties, including the Corbellos, that Lamson-Toce considered Daniel's application in violation of Order 29-L and state laws governing such applications. It was and is Lamson-Toce's position that no change could be made so long as Supplemental Order 252-A was effective and that the order was effective until annulled by the Commissioner. Nevertheless, Daniel pursued its unitization request in preference to seeking judicial review of Supplemental Order 252-A.
The hearing requested by Daniel was held by the Commissioner on December 18, 1980, as scheduled. Corbello attended and participated in the hearing. Lamson-Toce also appeared and opposed Daniel's requested unitization. Both Daniel and Lamson-Toce introduced testimony and geological evidence and data in support of their respective positions. The Commissioner took the matter under advisement.
On February 11, 1981, the Commissioner issued Order 252-A-1, effective December 18, 1980, creating a new single unit which includes portions of the three prior Pujol Sand Units that the Commissioner found productive on December 18, 1980. The Commissioner's configuration did not conform to the unitization proposed by either Daniel or Lamson-Toce, rather, it was based on the Commissioner's staff's independent analysis of all available data. On March 2, 1981, the Commissioner made the hereinablve [hereinabove] mentioned non-substantive changes in Order 252-A-1.
Although Corbello was present at the December 18, 1980 hearing and signed an attendance card, he denied having received notice of the Commissioner's resulting orders. The record shows, however, that notice of the orders were sent to all attending persons who signed attendance cards.
During and immediately following the December 18, 1980 hearing, Corbello made known to Daniel's agents that Corbello felt the matter was not going well insofar as Corbello's interests were concerned. He also suggested at these times that he felt some plan of action should be adopted to obviate the effect of what Corbello felt would be an unfavorable ruling. Following rendition of Order 252-A-1 on February 11, 1981, Corbello and agents of Daniel, immediately commenced prolonged, exhaustive and detailed discussion concerning the most suitable method of challenging Supplemental Order 252-A as being invalid and contesting Order 252-A-1 on the ground that its recreation of Unit 252-A violated Corbello's vested interests.
Again, Daniel was reluctant to sue the Commissioner. Corbello insisted that his lessee Daniel take some action and that costs of the proposed litigation be borne by *619 Daniel. After numerous meetings and telephone conferences between Corbello and representatives of Daniel, it was decided that suit would be brought in Corbello's name to challenge Orders 252-A and 252-A-1 and that Daniel would underwrite the cost of the action.
Order 252-A-1 was recorded in the records of Calcasieu Parish on February 27, 1981. A non-substantive correction of Order 252-A-1 was recorded in Calcasieu Parish March 16, 1981. Suit was filed August 31, 1981, more than six and one-half months folowoing [following] the February 11, 1981 rendition of Order 252-A-1.
Corbello's alleged lack of notice of Order 252-A addresses itself to two issues. First, the alleged nullity of Order 252-A for lack of notice and knowledge of Order 252-A as regards the defendants' plea of laches, that is commencement of running of the time for filing suit.
Laches is an equitable doctrine governing prescription of actions in those instances where the law does not provide a specific statutory limitation. Jordon [Jordan] v. Sutton, above.
Generally prescriptive statutes are strictly construed and any ambiguity is resolved against prescription and in favor of allowing the action to be brought to the end that a litigant may be afforded his day in court. State Ex Rel Guste v. Simoni, Heck and Associates, La., 331 So.2d 478 (1976).
As regards administrative review, however, the rule is that stability of orderly fiscal and administrative processes requires that review or appeal of such orders and decrees be commenced with all due diligence and speed. Stansbury v. City of Opelousas, 341 So.2d [33] 35 (La.App. 3d Cir.1976).
Legislative recognition of the need for early finality of administrative orders and decrees has been made evident in numerous instances wherein the legislature has consistently prescribed short periods in which such decrees and orders may be challenged judicially. For example, LSA-R.S. 49:964 B, applicable to administrative orders in general (including orders of the Commissioner) prescribes a 30 day period for application for review. Similarly, 30 day review application periods are provided for orders of the Civil Service Commission, La. Const.1974, Article X, Section 10; the Louisiana Tax Commission (Property Tax Assessments) LSA-R.S. 47:1857, 1858; Louisiana Commission on Governmental Ethics, LSA-R.S. 42:1142, and; the Louisiana Department of Public Safety, LSA-R.S. 32:414 and 668. A 20 day limitation applies to applications for review of decisions of the Commissioner of Agriculture, LSA-R.S. 40:931.16. Orders of the Board of Review, Office of Employment Security, must be reviewed in 15 days, LSA-R.S. 23:160, and those of the Louisiana Office of Employment Security must be reviewed within 10 days, LSA-R.S. 23:1728.
It is patent on the record that plaintiffs' application for review in this instance has prescribed pursuant to LSA-R.S. 49:964 B, which provides that such applications must be made within 30 days of the order questioned. Plaintiffs' alternative position is that the application is timely pursuant to LSA-R.S. 30:12 which expressly applies to Commissioner orders and which prescribes no specific period for making an application for review.
Applying the doctrine of laches applicable to a plea of prescription made pursuant to 30:12 above, the Court finds that plaintiffs' claims are barred by laches.
Plaintiffs had constructive knowledge of Order 252-A as of May 1, 1978, on which date the order was duly recorded in the Conveyance Records of Calcasieu Parish.
The record preponderates heavily in favor of the conclusion that Corbello had actual notice of 252-A upon its rendition in 1978. It is shown beyond the shadow of a doubt that Corbello had actual notice of 252-A in June of 1980, at least 14 months prior to seeking review. By participating in the hearing held December 18, 1980, to reconstruct unit 252-A plaintiffs at least tacitly accepted and recognized the validity *620 of 252-A considering the application for reconstruction presumed the validity of that order. In so doing, plaintiffs took a deliberate, calculated risk which ultimately redounded to their disadvantage. Since the doctrine of laches is based on equitable principles, it is appropriate to note the well established rule that he who seeks equity must do equity and apply with clean hands.
Regarding Order 252-A-1, plaintiffs delayed from February 11, 1981, to August 31, 1981, to seek review. The corrective order of March 2, 1981, is an inoperative factor in that it made no substantive change in original Order 252-A-1. The delay of six and one-half months due primarily to Daniel's reluctance to sue the Commissioner for fear of retaliatory reaction by the Commissioner in future actions, and to Corbello's attempts to persuade Daniel to file the action and underwrite the cost thereof, were motives which cannot equitably support their failure to seek a more timely review.
Daniels' aversion to filing suit on the ground it might prejudice the Commissioner against them is a sad commentary on the esteem accorded those in charge of administering our laws. This court finds such an alibi totally unacceptable as an insult to the integrity of public officials and cannot conceive such a premise as the basis for equitable relief.
The Court concludes, therefore, that insofar as time is a factor incident to a plea of laches, this action was brought untimely.
That Lamson-Toce and defendants would sustain material injury and loss if their plea of laches were denied, is amply supported by the evidence. In addition to the cost of drilling Toce-Pujol, a second well was drilled at a cost of $660,000.00 and which proved unproductive. This well would not have been drilled except for reliance upon the dissolution order. From initial production until December 18, 1980, Lamson-Toce paid royalties of $369,000.00 and working interest proceeds in the sum of $1,478,000.00 in reliance on the validity of the voluntary unit. Subsequent to December 18, 1980, survey and other costs, hereinabove mentioned, were incurred. Between December 18, 1980 and the filing of suit herein, royalties in the amount of $415,517.00 and working interests totalling $1,662,000.00 have been paid to interested parties, also in reliance upon the validity of 252-A-1. Payments of royalties and working interests have continued since institution of this action.
Assuming, arguendo, plaintiffs were successful herein, plaintiffs can reap no meaningful relief unless the distributions by Lamson-Toce were rescinded and revised distributions ordered based on the configuration of original unit 252-A which included plaintiffs' lands. This would cause a hardship on all parties interested. Significantly, Lamson-Toce, has no assurance it can recoup funds paid to royalty owners and working interests predicated upon assumed validity of 252-A.
As concerns the Commissioner's interest herein, LSA-R.S. 30:12, contains unmistakable evidence of legislative intent that matters before the Commissioner be expeditiously heard and finalized. This is necessarily so because the decisions of the Commissioner have tremendous effect on the decisions of explorers and drillers for oil and gas, which decisions normally involve considerable capital investment and property values of substantial proportions. The dependence of our economy for continued adequate production of oil and gas as sources of energy for heat, light and industrial power, as well as our armed forces reliance thereon for purposes of national defense, undoubtedly played some part in the legislative determination that Commissioner orders achieve rapid finality. Inordinate delays in this area could only discourage and deter efforts to explore for and produce vitally needed oil and gas because of industry reluctance to proceed upon Commissioner orders the finality of which could not be ascertained within a reasonable time.
Defendants importune the Court to fix 60 days as the time in which actions may be brought against the Commissioner pursuant to LSA-R.S. 30:12. They so urge on *621 the ground that said period is reasonable and accords with the longest statutory appeal period of 60 days for taking a devolutive appeal from final judgments in general. LA-C.C.P. Article 2087.
Since laches depends upon equitable principles, the court cannot logically and practically prescribe a precise period of time in such matters. Each case must obviously be determined on the facts involved. The court has searched the jurisprudence and found no case where a case has been barred by laches and the court has found the action should have been brought within a certain specified time. In each such instance the court has merely held the delay was unreasonable. See for example, Albritton v. Union Parish School Board, 307 So.2d 675 [676] (La.App. 2nd Cir.1975); Stansbury v. City of Opelousas, 341 So.2d 33 (La.App. 3d Cir.1976); State v. Orleans Parish School Board, 189 La. 488 [502], 179 So. 830 [834] (1938); State ex rel Calamari v. Orleans Parish School Board, 189 La. 488, 179 So. 834 [830]; Fontenot v. Evangeline Parish School Board, 185 So. 104 (La.App.)
In disposing of a plea of laches the sole function of the court is to determine whether there was unreasonable delay in bringing the demand and whether or not injury resulted or would result from allowing the suit. The fixing of a prescribed time for bringing an action is peculiarly and exclusively within the control and authority of the legislature. The court therefore declines to set a precise time for bringing an action pursuant to LSA-R.S. 30:12 and simply holds that in this action plaintiffs' claims are barred by laches.
In view of the court's determination of the plea of laches the court does not reach the merits of plaintiffs' claim.
For reasons hereinabove set forth:
IT IS ORDERED, ADJUDGED AND DECREED that judgment be and is hereby rendered herein in favor of defendants, Commissioner of Conservation, and others, and against plaintiffs, William G. Corbello, and others, sustaining defendants' plea of laches and dismissing plaintiffs' action, with prejudice; all costs of this suit to be paid by plaintiffs.
JUDGMENT READ, RENDERED AND SIGNED in Open Court at Baton Rouge, Louisiana, this 15th day of December, 1982.
NOTES
[1] L.S.A.-R.S. 49:964, Judicial review of adjudication, as cited in pertinent part, provides that:

* * * * * *
"A. A person who is aggrieved by a final decision or order in an adjudication proceeding is entitled to judicial review under this Chapter whether or not he has applied to the agency for rehearing, without limiting, however, utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law. A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy and would inflict irreparable injury.
"B. Proceedings for review may be instituted by filing a petition in the district court of the parish in which the agency is located within thirty days after mailing of notice of the final decision by the agency or, if a rehearing is requested, within thirty days after the decision thereon. Copies of the petition shall be served upon the agency and all parties of record."
[2] L.S.A.-R.S. 30:12, Court review and injunction; venue; procedure; burden of proof, provides, in pertinent part, that:

"An interested person adversely affected by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the commissioner hereunder, or by an act done or threatened thereunder, and who has exhausted his administrative remedy, may obtain court review and seek relief by a suit for an injunction against the commissioner as defendant. Suit shall be instituted in the district court of the parish in which the principal office of the commissioner is located and shall be tried summarily...."
[3] See the particular subsection noted in the text of this opinion.

"9.1. Termination of units; conditions; procedure; issuance of orders
"A. Any unit or units established pursuant to the authority contained in this Chapter, shall unless sooner terminated, extended or otherwise modified by order of the commissioner, remain in full force and effect so long as:
"(1) a well is producing from the pool for which the unit or units were established;
"(2) a well is completed in the pool for which the unit or units were established and, although not producing, has been proved to be capable of producing;
"(3) drilling, reworking, recompletion, plugging back or deepening operations are being conducted on a well to secure or restore production from the pool for which the unit or units were established; or
"B. If a period of one year and ninety days elapses without the occurrence of any of the conditions specified in Paragraphs (1), (2), or (3), of Subsection A of this Section, upon application being made therefor, the commissioner may, by order issued after ten days legal notice, and without the necessity of a public hearing in the absence of objection, terminate all units within the pool.
"C. The commissioner shall prescribe, issue, amend, and rescind such orders, rules and regulations as he may find necessary or appropriate to carry out the provisions of this Section. Among other things, such orders, rules, and regulations shall prescribe the form and substance of the application for unit termination, and all statements, declarations, and supporting evidence to be filed therewith.
"D. The provisions of this Section are intended to and shall affect presently existing units; however, in those instances where more than one year and ninety days have elapsed prior to the effective date of this Section without any of the conditions specified in Paragraphs (1), (2), or (3) of Subsection A of this Section having occurred, such unit or units shall not be subject to termination hereunder until an additional period of ninety days has elapsed after the effective date of this Section without any of the said conditions having occurred.
"E. Any order issued pursuant to this Section shall be filed for record as provided in Section 11.1 of this Title.
"F. Any future wells completed within the boundaries of any unit or units terminated pursuant to this Section shall, upon a new unit application being made to the commissioner, be entitled to a unit hearing as otherwise provided for by law as fully as though the original unit or units had never been created, and any such new unit or units shall not be limited in any way by the prior hearing or pre-existing unit or units.
"G. No provision of this Section shall be construed so as to in any way limit the authority otherwise granted to the commissioner to terminate, extend, or otherwise granted to the commissioner to terminate, extend, or otherwise modify any unit or units."
[4] Id.
[5] Id.