818 So.2d 12 (2001)
COASTAL ENVIRONMENTAL SPECIALISTS, INC.
v.
CHEM-LIG INTERNATIONAL, INC., Chem-Lig International Industries, Inc. & David Stutz.
No. 2000 CA 1936.
Court of Appeal of Louisiana, First Circuit.
November 9, 2001.
*14 Floyd J. Falcon, Jr., Baton Rouge, Counsel for Plaintiff/Appellant, Coastal Environmental Specialists, Inc.
Stephen W. Glusman, Baton Rouge, Counsel for Defendant/Appellee, Greater Baton Rouge Port Commission.
Patrick F. McGrew, Baton Rouge, Counsel for Defendant/Appellee, David Stutz.
Before: WHIPPLE, FOGG and GUIDRY, JJ.
WHIPPLE, J.
Plaintiff, Coastal Environmental Specialists, Inc. (hereinafter "Coastal"), appeals the grant of partial summary judgment in favor of defendant, the Greater Baton Rouge Port Commission (hereinafter "the Port").[1] For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Chem-Lig International, Inc., later Chem-Lig International Industries, Inc., leased a portion of land from the Port of Greater Baton Rouge where Chem-Lig housed a chemical plant and warehouse.[2] Chem-Lig processed, manufactured, and sold sodium lignosulfate, an anionic water soluble chemical used as drilling mud.
In March of 1996, Chem-Lig personnel discovered that a 20,000 gallon frac tank,[3] containing "wash water" had been leaking on the Chem-Lig premises over a period of time. The site was inspected by Kenneth Holmes, an environmental quality specialist employed by the Department of *15 Environmental Quality (hereinafter "DEQ"), who also reviewed Chem-Lig's spill plan for the clean-up of the facility. The plan required removing the spilled wash water and remediating the stained soil at the site.[4] Acting on behalf of DEQ, Holmes further required that remediation be performed at a location where material had spilled on the ground from a rail car as well as an area where material had drained into some ditches. The ditches were not within Chem-Lig's facility, but nonetheless, the source of the spill found in the ditches was determined to be from the Chem-Lig property. Holmes also concluded (and later testified) that the contaminated surface layer of soil was not hazardous waste.
Chem-Lig then hired Coastal to perform the remediation and clean the areas affected by the spill. The DEQ had given Chem-Lig until March 20, 1996, to have the clean-up completed. On March 26, 1996, Holmes inspected the Chem-Lig facility and determined that the work had been performed satisfactorily. The material from the March clean-up was stored in roll-off boxes rented daily from Coastal on the Chem-Lig site.
In May of 1996, after a hard rain, the same material spilled in March was again found on Chem-Lig's plant facility. By this time, Chem-Lig had experienced financial problems and was in the process of closing its business. On May 6, 1996, representatives from the Port and DEQ met with David Stutz, the president and general manager of Chem-Lig, to discuss what had to be done in order to clean up and remediate the situation at the Chem-Lig facility. Stutz advised them at that time that Chem-Lig "was not going to make it" and that they were not financially able to clean up the second spill. Chem-Lig subsequently shut down all operations in May of 1996. Ultimately, the Port utilized their own maintenance staff, rented the necessary equipment, and hired Rust Environmental, an environmental engineering firm, to clean up the spill. After Chem-Lig shut down operations, the roll-off boxes rented from Coastal containing the material from the initial clean-up in March remained on the site until the Port eventually had them removed in June or July.
On December 5, 1996, Coastal filed suit against the Greater Baton Rouge Port Commission seeking to recover the balance of $85,842.00 due from Chem-Lig for the rental fees and work performed in connection with the clean-up of the March spill. In its petition, Coastal also alleged that Port representative, Tony Rizzuto, specifically agreed to pay the daily rentals for the roll-off boxes previously leased by Chem-Lig for the period of May 7, 1996 to May 23, 1996. Coastal contended that as the owner of the pollution source, the Port was liable under the provisions of LSA-R.S. 30:2276, et seq. In addition, Coastal alleged that the Port was unjustly enriched by the services performed by Coastal.
In response, the Port filed a motion for partial summary judgment seeking to dismiss plaintiff's claims for payment of expenses incurred pursuant to its contract with Chem-Lig, contending that the provisions of LSA-R.S. 30:2276 are inapplicable herein and that plaintiff also has no remedy under any theory of unjust enrichment.
By judgment dated March 22, 2000, the trial court granted partial summary judgment in favor of the Port, dismissing Coastal's claims against the Port for payment *16 for work that Coastal had performed pursuant to its contract with Chem-Lig. The trial court reserved Coastal's claims for payment of daily rental on the storage boxes after May 7, 1996. Coastal appeals, assigning the following as error:
1. The Trial Court erred as a matter of law in granting summary judgment dismissing Coastal's cause of action under R.S. 30:2276.
2. The Trial Court erred in failing to realize that a genuine issue of material fact existed as to whether the material in the leaking frac tank was "hazardous" within the meaning of R.S. 30:2276.
[3.] The Trial Court erred as a matter of law in granting summary judgment dismissing Coastal's claim for unjust enrichment.
[4.] The Trial Court erred in failing to recognize that Coastal had submitted sufficient evidence to establish a cause of action for unjust enrichment.
[5.] The Trial Court erred in failing to recognize that Coastal had submitted sufficient evidence to establish a cause of action under Civil Code Article 2297-quasi-contract for managing the affairs of another.

DISCUSSION
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1st Cir.6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966. Appellate courts review summary judgments de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Sanders, 96-1751 at p. 7, 696 So.2d at 1035.
Summary judgments are now favored, and the documents submitted by both parties are to be equally scrutinized. The initial burden remains with the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense, then the non-moving party must produce factual support sufficient to satisfy his evidentiary burden at trial. LSA-C.C.P. art. 966(C)(2). If the non-moving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. LSA-C.C.P. arts. 966 and 967; Davis v. Specialty Diving, Inc., 98-0458, 98-0459, pp. 4-5 (La.App. 1st Cir.4/1/99), 740 So.2d 666, 669, writ denied, 99-1852 (La.10/8/99), 750 So.2d 972. Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Davis, 98-0458, 98-0459 at p. 5, 740 So.2d at 669.

LIABILITY FOR HAZARDOUS SUBSTANCE

(Assignments of Error Nos. 1 & 2)
In these assignments, Coastal contends that the trial court erred by failing to realize that a genuine issue existed as to whether the material in the leaking frac tank was "hazardous," thereby entitling Coastal to recover under Title 30, Chapter 12 entitled "Liability for Hazardous Substance Remedial Action," and more specifically, the following pertinent provisions of LSA-R.S. 30:2276:
A. The court shall find the defendant liable to the state for the costs of remedial *17 action taken because of an actual or potential discharge or disposal which may present an imminent and substantial endangerment to health or the environment at a pollution source or facility, if the court finds that the defendant performed any of the following:
(1) Was a generator who generated a hazardous substance which was disposed of or discharged at the pollution source or facility.
(2) Was a transporter who transported a hazardous substance which was disposed of or discharged at the pollution source or facility.
(3) Was a disposer who disposed of or discharged a hazardous substance or hazardous waste at the pollution source or facility.
(4) Contracted with a person for transportation or disposal at the pollution source or facility.
(5) Is or was the owner or operator of the pollution source or facility subsequent to the disposal of hazardous waste.
B. The court does not have to find that the defendant was negligent, knew that the hazardous substance was being improperly disposed of, or that the activity was illegal at the time of disposal.
C. The defendant shall be responsible for his proportionate contribution to the remedial costs as defined in this Chapter.
D. The liability of the defendants shall be limited to those costs which can be calculated by the court upon presentation of evidence.
* * * * *
G. (3) In furtherance of the purpose of this Chapter, a person who has incurred remedial costs in responding to a discharge or disposal of a substance covered by this Chapter, without the need for an initial demand by the secretary, may sue and recover such remedial costs as defined in R.S. 30:2272(9) from any person found by a court to have performed any of the activities listed in Subsection A if the plan for remedial action was approved by the secretary in advance or, if an emergency, the secretary was notified without unreasonable delay and the secretary accepts the plan thereafter. An action by a person other than the secretary shall not be barred by the failure of the secretary to demand participation in the remediation. Such action shall be barred if the plaintiff does not make written demand on the defendant by certified mail, return receipt requested, at least sixty days prior to initiation of suit based on the cause of action provided in this Subsection.
At the outset, we note that in order for plaintiff to be afforded any relief under the above-stated provisions, plaintiff was required to demonstrate that the material that leaked at the Chem-Lig facility was, in fact, hazardous. If the material was hazardous, plaintiff must next establish that the Port either generated the hazardous substance, transported the hazardous substance, disposed of or discharged the hazardous substance, contracted for transportation or disposal at the pollution source, or was the owner or operator of the pollution source or facility subsequent to the disposal of hazardous waste. LSA-R.S. 30:2276 A.
In support of its motion for summary judgment, the Port introduced the deposition testimony of Kenneth Holmes, a DEQ environmental quality specialist, who testified that, based on the results of the soil samples taken, the material found in the soil that had leaked was not hazardous waste. As noted in his report and testimony, the material was "washwater [sic] containing *18 a nonhazardous lignosulfonate based product." Holmes specifically noted that had the material been classified as hazardous waste, the DEQ would have monitored the situation more closely.
The deposition testimony of David Stutz, the president and general manager of Chem-Lig, was also introduced by the Port in support of its motion for summary judgment. Stutz testified that Chem-Lig collected raw material from pulp and paper industry by-product and processed it into a family of usable industrial products. He likewise testified that the raw materials and the finished product were not hazardous under any conditions.
On appeal, Coastal contends that the DEQ inspector incorrectly determined that the material was nonhazardous, largely in fact because he relied on the results of a soil analysis taken by either Chem-Lig or Coastal rather than conducting his own soil analysis. However, Coastal does not allege nor does the record contain any evidence upon which Coastal can rely to establish any particular flaw or defect in the analysis conducted or the results thereof. Instead, Coastal merely argues that because the DEQ required that the material be cleaned up from the ditches and soiled areas, as exhibiting characteristics that were not acceptable under Louisiana's applicable water discharge standards, the material must be hazardous. In essence, Coastal is contending that it is axiomatic that all materials that do not meet water quality standards are hazardous. However, Coastal sites no authority or support for this proposition, nor does the record evidence support this claim.
Louisiana Revised Statutes 30:2276 G, is penal in nature and must be strictly construed. Goodwin v. Agrilite of Louisiana, 26,061, p. 7 (La.App. 2nd Cir.9/21/94), 643 So.2d 249, 254. We are presented with no evidence in the record that would tend to show that the "wash water" was, in fact, considered to be a hazardous substance, an element of Coastal's claim upon which it would bear the burden of persuasion and proof at trial. Instead, we are presented with direct testimony from the DEQ inspector, who, after conducting an independent investigation, evaluation of the site, the material, and the soil analysis results, determined that the material was not hazardous. Based on the testimony and evidence found in the record, and the absence of any countervailing evidence, we find no error in the trial court's conclusion that no genuine issue of material facts remained and that the material was not hazardous, thereby precluding plaintiff from recovering under the provisions of LSA-R.S. 30:2276.
Thus, these assignments lack merit.

UNJUST ENRICHMENT

(Assignment of Errors Nos. 3 & 4)
Coastal further contends that the trial court erred in dismissing its claims against the Port under the theory of unjust enrichment. The action for unjust enrichment is addressed in LSA-C.C. art. 2298, which provides as follows:
A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.
The extent of the enrichment or impoverishment is measured as of the time *19 the suit is brought or, according to the circumstances, as of the time the judgment is rendered.
The root principle of unjustified enrichment is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives an economic benefit for which he has not paid. See Scott v. Wesley, 589 So.2d 26, 27 (La.App. 1st Cir.1991). An action for unjust enrichment is allowed only when the plaintiff has no other remedy at law. However, where there is a rule of law directed to the issue, an action must not be allowed to defeat the purpose of said rule. Carriere v. Bank of Louisiana, 95-3058, p. 12 (La.12/13/96), 702 So.2d 648, 657. Stated differently, unjust enrichment principles are only applicable to fill a gap in the law where no express remedy is provided. Louisiana National Bank of Baton Rouge v. Belello, 577 So.2d 1099, 1102 (La.App. 1st Cir.1991).
In Minyard v. Curtis Products, Inc., 251 La. 624, 652, 205 So.2d 422, 432 (1967), the Louisiana Supreme Court set forth five prerequisites that must be satisfied to successfully invoke the action, noting that there must be: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and the impoverishment, and (5) no other remedy at law available to the impoverishee. Commercial Properties Development Corp. v. State Teachers Retirement System, XXXX-XXXX, p. 2 (La.App. 1st Cir.3/28/01), 808 So.2d 534, 539. To recover under the doctrine of unjust enrichment, a claimant must prove all five elements; if any one is not proven, the claimant's recovery is barred. Bernard v. First Republic Life Insurance Company, 510 So.2d 97, 102 (La.App. 1st Cir.1987).
The fifth requirement, that there be no other practical remedy at law available to the impoverishee, is critical to the resolution of this case. In Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 538 So.2d 569 (La.1989), the Louisiana Supreme Court held that the existence of a claim on an express or implied contract precludes application of the unjust enrichment theory, because the potential claim constitutes a practical remedy at law available to the impoverishee. Furthermore, in cases where a claim has been exercised and a judgment obtained, it is most apparent that there is a practical remedy available at law. See Pilgrim Life Insurance Company of America v. American Bank and Trust Company of Opelousas, 542 So.2d 804, 807 (La.App. 3rd Cir.1989); Central Oil & Supply Corporation v. Wilson Oil Company, Inc., 511 So.2d 19, 21 (La.App. 3rd Cir.1987), writ denied, 535 So.2d 747 (La.1989).
In Scott v. Wesley, Scott, a home builder, obtained a judgment against Wesley, the person with whom he contracted to build the home. After unsuccessful attempts to collect on the judgment, Scott filed suit and obtained a judgment against the landowner under the theory of unjust enrichment. On review, this court reversed the trial court's award against the landowner, stating:
In Royal Oldsmobile Co., Inc. v. Yarbrough, 425 So.2d 823 (La.App. 5th Cir. 1982), plaintiff's claim in unjust enrichment was denied because the court found that he had a practical remedy at law, even though his purchaser had moved to another state. The court explained: "Because appellants chose not to further pursue [purchaser] in California is not sufficient reason to impose liability on [enrichee]. The ease of attaining a remedy is not a sufficient reason *20 to apply unjust enrichment". Royal, 425 So.2d at 825.
Scott v. Wesley, 589 So.2d at 28.
In the instant case, Coastal has a remedy at law against Chem-Lig. In fact, as noted previously, Coastal has already instituted suit against Chem-Lig International, Inc., Chem-Lig Industries, Inc., and David Stutz in the Eighteenth Judicial District Court, Docket No. 27,855. In that suit, Coastal seeks to recover the balance of $85,842.00 for the clean-up work performed and rental fees on the bases of Coastal's initial proposal to Chem-Lig and its acceptance by David Stutz, a supplemental contract executed by David Stutz, and David Stutz's own personal guarantee. Coastal clearly admits throughout its petition filed in that suit and in its brief to this court that the nature of its relationship with Chem-Lig was contractual. Yet, in brief, Coastal complains that "any judgment obtained [against Chem-Lig] would be worthless," and states that "[i]t is of no moment that the Port's contract with Chem-Lig required Chem-Lig to pay for the clean up," thereby asking this court to completely ignore the legal remedy available to it. Applying the above-stated legal precepts that we are bound to follow, we find no support for Coastal's arguments. Whether Coastal can succeed in recovering and collecting in its suit against Chem-Lig is not determinative. Clearly, a legal remedy is available to Coastal. There is no "gap in the law" that prevents Coastal from recovering from Chem-Lig.
Inasmuch as another remedy at law was available to Coastal, under the above law and jurisprudence, an action by Coastal premised upon an unjust enrichment theory likewise must fail.
Accordingly, we find no merit to these assignments.

QUASI-CONTRACT / NEGOTIORUM GESTIO

(Assignment of Error No. 5)
In this assignment, Coastal claims that the trial court erred in failing to recognize its cause of action pursuant to LSA-C.C. art. 2297, obligations of the owner, which provides as follows:
The owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses.
Louisiana Civil Code article 2292, defines management of affairs as follows:
There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.
A quasi-contract evolves from the theory of negotiorum gestio, or the unauthorized management of affairs of another. This quasi-contract comes about when a person, the gestor, voluntarily undertakes to manage another's affairs, whether the recipient of the benefit of this management is aware of it or not. Kirkpatrick v. Young, 456 So.2d 622, 624 (La. 1984). The gestor is under the obligation to act as a prudent administrator, and the one whose business has been well-managed is under an obligation to indemnify the manager in all personal engagements he has contracted and to reimburse him all useful and necessary expenses. LSA-C.C. arts. 2298, 2299; Taylor v. Taylor, 97-1565, p. 6 (La.App. 1st Cir.6/25/99), 739 So.2d 256, 261, writ denied, 99-2202 (La.11/5/99), 750 So.2d 188. The management is purely voluntary. Tyler v. Haynes, 99-1921, p. 7 (La.App. 3rd Cir.5/3/00), 760 So.2d 559, 563. It is essential *21 to negotiorum gestio that the manager be doing another's business, not his own business. Burns v. Sabine River Authority, 614 So.2d 1337, 1340 (La.App. 3rd Cir.), writ denied, 617 So.2d 935 (La.1993).
Coastal claims that it is entitled to recover its expenses under the theory of negotiorum gestio. In the case sub judice, Coastal was acting under the authority vested in it by Chem-Lig pursuant to its contract with Chem-Lig. The contract gave Coastal full authority to incur expenses concerning the clean-up of Chem-Lig's facility, in return for which Coastal was to receive payment from Chem-Lig. The management was not "purely voluntary," but rather, was pursuant to its contract with Chem-Lig. At the time Coastal performed the services contracted for by Chem-Lig, Coastal fully expected payment as the parties previously agreed.
The Port argues in brief that "the law of quasi contract does not extend to elevate the contractual rights of The Port against Chem-Lig, nor does the law transform The Port into a surety to protect the appellant from losses on an account receivable created in the course of the appellant's business operations." On review, we agree.
Thus, this assignment likewise is without merit.

CONCLUSION
Accordingly, the March 22, 2000 judgment of the trial court is affirmed. Costs in this matter are assessed against the plaintiff/appellant, Coastal Environmental Specialists, Inc.
AFFIRMED.
NOTES
[1] Coastal filed separate suits in the Eighteenth Judicial District Court naming "Chem-Lig International, Inc., Chem-Lig International Industries, Inc. & David Stutz" in Docket No. 27,855, and the "Greater Baton Rouge Port Commission" in Docket No. 28,072, as defendants. On motion of Coastal, those cases were consolidated in the trial court.
[2] David W. Stutz, president and general manager of Chem-Lig International, Inc., testified that at some point in the late eighties, a second corporation was formed, Chem-Lig International Industries, Inc., that acquired all of the stock of Chem-Lig International, Inc. Chem-Lig International, Inc. assigned the lease with the Port to Chem-Lig International Industries, Inc. We will refer to these companies hereinafter as "Chem-Lig."
[3] A frac tank is a large rectangular shaped container with wheels on one end that can be towed behind a truck.
[4] Remediating the soil consisted of removing the layer that was stained with the wash water and disposing of it.