583 So.2d 1139 (1991)
DAVIS OIL COMPANY
v.
STEAMBOAT PETROLEUM CORPORATION.
No. 91-C-0145.
Supreme Court of Louisiana.
June 28, 1991.
*1140 L. Linton Morgan, Robert L. Redfearn, Judy P. Martinez, Eddie L. Sapir, New Orleans, Servando Caesar Garcia, III, Metairie, for defendant-applicant.
Matthew J. Randazzo, III, Vernon L. Terrell, Jr., F. Henri Lapeyre, New Orleans, for plaintiff-respondent.
John M. McCollam, Margaret P. Sullivan, New Orleans, amicus curiae.
Donald W. Doyle, Clyde H. Jacob, III, New Orleans, amicus curiae.
DENNIS, Justice.
We are called upon to decide whether the operator of a forced drilling unit who initiated the unitization process may hold an adjacent lessee personally liable for dry hole well costs because the lessee requested the Commissioner to modify the proposed unit to include part of the lessee's leasehold. In the present case, in response to the adjacent lessee's counter-proposal, the Commissioner included parts of its leaseholds in two proposed units. Consequently, part of the land under the adjacent lessee's leases comprised 4.6859% of the acreage of one unit and 2.58931% of the other. After drilling a dry hole in each of the two units, the operator sought to hold *1141 the lessee personally liable for a proportionate share of the well costs, but the trial court ruled that such costs could not be recovered except out of production. The court of appeal reversed, holding that the lessee was personally liable because it took an active role in the unitization proceedings by submitting and arguing in support of its counterplan for unitization. Davis Oil Co. v. Steamboat Petroleum Co., 570 So.2d 495 (La.App. 5th Cir.1990). We reverse. A non-operating owner of a mineral interest, who does not consent to operations within a compulsory drilling unit by an operating owner, has no liability for the costs of development and operations except out of his share of production. Under the circumstances of the present case, in which the non-operating lessee merely introduced a counter-proposed unit plan at the Commissioner's hearing, prior to the drilling of the dry holes, only as a precaution against the uncompensated drainage of part of the land underlying its leases, the lessee did not consent to the unit operations.

FACTS
Plaintiff, Davis Oil Company, and defendant, Steamboat Petroleum Corporation, held separate mineral leases on adjacent property. On March 5, 1984 Davis Oil notified the Commissioner of Conservation and all interested parties, including defendant, of its intent to request a hearing before the Commissioner to consider Davis Oil's proposed unitization plan which would create several drilling and production units in the East Manchester Field located in Calcasieu Parish. The geographic units proposed by Davis Oil did not include two adjacent tracts (the Mott tract and the Richard tract) leased by Steamboat. Steamboat filed a counterplan in which it opposed Davis Oil's plan and urged the Commissioner to adopt Steamboat's unitization plan which included parts of the tracts leased by Steamboat. A public hearing was held on May 29, 1984 at which Davis Oil and Steamboat each appeared and urged the Commissioner to adopt its unit plan. Although the Commissioner's unitization order did not totally accept either Davis Oil's plan or Steamboat's plan in toto, it did include in the units small parts of the lands upon which Steamboat held leases. According to the official unit survey plats, the Richard tract (leased by Steamboat) contributed 14.9949 acres or 4.6859% to one unit and the Mott tract (leased by Steamboat) contributed 8.2858 acres or 2.58931% to the other unit. The Commissioner's order also appointed Davis Oil as the operator of the units and authorized Davis Oil to drill unit wells.
Davis Oil drilled a well in each unit, both of which were dry holes. Steamboat was invited to participate in the drilling of each well on the basis of its interest in the units. Steamboat refused to participate. Davis Oil submitted invoices to Steamboat totaling $90,567.31 for Steamboat's proportionate share of the costs of one well and $186,409.13 for its proportionate share of the costs of the other. Steamboat refused to pay, and Davis Oil instituted this action seeking cash payments from Steamboat. Steamboat claims that it is not required to pay the costs in cash and that Davis Oil's sole remedy is reimbursement from the proceeds of production from the wells. The trial court rendered judgment in favor of defendant, Steamboat, and dismissed Davis Oil's claims with prejudice. The court of appeal reversed holding that Steamboat was liable for its share of drilling costs in cash. Davis Oil Co. v. Steamboat Petroleum Co., 570 So.2d 495 (La. App. 5th Cir.1990). We granted Steamboat's writ application. 575 So.2d 381 (La. 1991).

THE NEED TO ALLOCATE WELL COSTS BETWEEN THE OPERATING AND NON-OPERATING PARTIES IN THE UNIT
In order to prevent waste in the recovery of oil and gas from a producing formation located beneath separately owned or leased tracts of land and to protect the rights of each separately owned or leased tract of land overlying a common source of supply, the legislature has granted the Commissioner of Conservation the statutory authority to establish compulsory drilling units. La.R.S. 30:4; La.R.S. 30:9; *1142 La.R.S. 30:10; see also Crawford v. Texaco, Inc., 40 F.R.D. 381 (S.D.N.Y.1966); Digby, The Conservation Laws and Their Administration, 24 Tul.L.Rev. 155 (1949). The general concept behind the establishment of drilling units is to prevent adjoining landowners or leaseholders from having to drill protective offset wells on their premises by permitting them to share production proportionately to the area of their acreage drained by the unit well. Superior Oil Co. v. Humble Oil & Refining Co., 165 So.2d 905 (La.App. 4th Cir.), writ refused, 246 La. 842, 167 So.2d 668 (1964). As a result of these compulsory drilling units, there has arisen a need for a rule allocating the costs between the unit operator and all non-operating parties who share in the unit's production.
The difficulty faced by judges and legislators in developing a rule that will adequately balance the rights of the unit operator and the non-operating parties whose interests have been pooled in a forced drilling unit is indicated by the substantial differences between the different state approaches to the problem. Kramer, Compulsory Pooling and Unitization: State Options in Dealing with Uncooperative Owners, 7 J. Energy L. & Pol'y 255 (1986); Note, Oil and Gas-Forced Drilling Unit-Compulsory Payment In Cash of Pro-Rata Well Costs, 39 Tul.L.Rev. 381 (1965). A rule that requires landowners or leaseholders to share in all costs and all production on the same proportional basis may work harshly on a party with little available cash. 1 B. Kramer & P. Martin, The Law of Pooling and Unitization, § 12.01 (3rd ed. 1989). On the other hand, a rule that requires the operating party to absorb all losses but forces the operating party to share all profits will work harshly on that risk-taker whose efforts have led to production. Id. In fact, this rule will encourage people who might otherwise contribute to the costs in advance to hold out until the results of the drilling are known, since they can get the benefits of the well without the risks. Id.

STEAMBOAT'S LIABILITY
The statutory law in effect on the date of the compulsory unitization order provided that, when the Commissioner of Conservation requires owners of separate tracts to pool their interests and develop their lands as a drilling unit, the cost of development and operation of the pooled unit "chargeable by the operator to the other interested owners" shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. La.R.S. 30:10(A)(1)(c) (1950).[*] Because the law did not specify when and how such costs were or were not "chargeable" to non-operating owners, and because the parties failed to plead and prove a custom governing the question, no rule for the particular situation in the present case may be derived directly from either source of law. Accordingly, this court is bound to proceed according to equity, i.e., resorting to justice, reason, and prevailing usages. La.Civ.Code art. 4 (1987). In making wise use of these resources, however, it is appropriate and advisable for us to rely for guidance upon the substantial body of jurisprudence and doctrine. Tete, The Code, Custom and the Courts: Notes Toward a Louisiana Theory of Precedent, 48 Tul. L.Rev. 1 (1973).
It has been noted, and is perhaps self-evident, that the operation of a mineral production unit is similar to the situation in which a tract of land or a mineral lease is owned in indivision by several co-owners. See McNamara, Unitized Production Rights of Operators and Non-operators, 31 La.Min.L.Inst. 194 (1984); McCollam, Legal Relations Among Parties to Compulsory Units, 15 La.Min.L.Inst. 69 (1968). Consequently, some of the legal precepts applicable in such cases, particularly those developed in the instance in which one co-owner drills the well on the common property, with or without the consent of his co-owners, may help us to decide equitably. See McCollam, Legal Relations Among Parties *1143 to Compulsory Units, id. at 96. These principles evolved from general civil law doctrine and were adapted through litigation, usage and doctrine to modern mineral law. See Mire v. Hawkins, 249 La. 278, 186 So.2d 591 (1966); Crichton v. Lee, 209 La. 561, 25 So.2d 229 (1946); Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919); Freeman v. Depression Oil Co., 159 So. 192 (La.App. 2nd Cir.1935); see also Moody v. Arabie, 498 So.2d 1081 (La.1986); 1 M. Planiol, Treatise on the Civil Law No. 2497 (12th ed. La.St.L.Inst. trans. 1959); 2 Aubry & Rau, Droit Civil Francais, Property § 221 (7th ed. La.St. L.Inst. trans. 1966); Harrell, Problems Created by Coownership in Louisiana, 32 La. Min.L.Inst. 381 (1985); McNamara, Unitized ProductionRights of Operators and Non-operators, supra; McCollam, Legal Relations Among Parties to Compulsory Units, supra; c.f., La.Civ.Code arts. 797 et seq. (although these articles did not become effective until January 1, 1991, the Official Revision Comments reveal that they represent basic civilian principles inherent in the Louisiana Civil Code of 1870).
Felicitously, several of these principles have been refined and codified as part of the Louisiana Mineral Code. After recognizing that mineral rights are susceptible of ownership in indivision and providing for when co-ownership exists, La.R.S. 31:168 et seq., the Mineral Code provides for the rights and consequences arising from co-ownership of mineral rights. La. R.S. 31:174-178. A use or possession of a mineral right inures to the benefit of all co-owners of the right. La.R.S. 31:174 (and Official Comment thereto); Hodges v. Norton, 200 La. 614, 8 So.2d 618 (1942). A co-owner of a mineral servitude may not conduct operations on the property subject to the servitude without the consent of co-owners, except in specially prescribed circumstances, and a co-owner of the servitude who does not consent to such operations has no liability for the costs of development and operations except out of his share of production. La.R.S. 31:175. A co-owner of a mineral servitude may act to prevent waste or the destruction or extinction of the servitude, but he cannot impose upon his co-owner liability for any costs of development or operation or other costs except out of production. La.R.S. 31:176. Similarly, a co-owner of the lessee's interest in a mineral lease may act to prevent damage or loss of the lease and to protect the interest of all, but cannot impose upon his co-owner liability for any costs or expenses except out of production. La.R.S. 31:177.
The underlying equity considerations lead us to conclude that the Mineral Code precepts should be adopted and applied by analogy in deciding the issues raised by the present case. Accordingly, we decide that a non-operating owner or lessee, who does not consent to operations within a compulsory drilling unit by a unit operator, has no liability for the costs of development and operations except out of his share of production. This precept is consistent with an implication in this Court's opinion in Hunter Co., Inc. v. McHugh, 202 La. 97, 11 So.2d 495 (1942) and usage based thereon limiting the operating party seeking to recover a non-operating party's proportionate share of costs to the exclusive remedy of withholding it from production proceeds. See Napper, Recent Developments in Legislation, 32 La. Min.L.Inst. 317, 319-321 (1985); Jorden, Unit Well Costs, 14 La.Min.L.Inst. 15, 23 (1967); Hardy, Mineral Rights, 26 La. L.Rev. 542, 564 (1966).
Applying this principle to the present case, we conclude that Steamboat is not liable for the drilling costs incurred by Davis Oil, except out of production. Because Steamboat did not expressly or implicitly consent to Davis Oil's operations and because there was no production, the wells having been dry holes, Steamboat is not liable for any such costs. Davis Oil initiated the formation of the compulsory drilling unit without soliciting Steamboat's advice or consent. Davis Oil invited Steamboat to participate in drilling the wells, but Steamboat rejected the offer. Under these circumstances, the mere fact that Steamboat filed a modified plan with the Commissioner in an effort to prevent drainage *1144 from its lands without compensation by Davis Oil's operations did not signify or imply that Steamboat approved or consented to the operations.
The present case is distinguishable from a situation such as that presented in Superior Oil Co. v. Humble Oil & Refining Co., 165 So.2d 905 (La.App. 4th Cir.1964). In that case the court of appeal held that the owner of oil interests who had drilled a producing well before the application of an adjoining owner for the establishment of a forced drilling unit was entitled to recover in cash the proportionate share of well costs allocated to that owner and was not limited to reimbursement from the proceeds of production. We agree with the result reached by the appeals court. Under the circumstances of that case, Humble Oil plainly ratified and consented to Superior Oil's development and operations. Superior had originally drilled a well on its own lease for its own account. After completion of the producing well, Humble, an adjoining lessee, provoked a unitization hearing before the Commissioner, which resulted in an order creating a forced drilling unit composed of the leases of Superior, Humble and Shell Oil Companies, with Superior's well designated as the unit well. Superior had allegedly incurred drilling costs of approximately $300,000.00. As a result of the unitization provoked by Humble, Superior was deprived of 55% of the total production it would have received otherwise. See Hardy, Mineral Rights, 26 La. L.Rev. 542, 565 (1966); Comment, Oil and Gas-Forced Drilling UnitCompulsory Payment In Cash of Pro-rata Well Costs, 39 Tul.L.Rev. 381 (1965).
Under the circumstances of the Superior Oil Co. case, Humble's actions in taking the initiative to form an operating unit including an already producing well resulting from Superior's successful operations reasonably can be interpreted only as implying Humble's consent to those operations. On the other hand, in the present case, Steamboat's mere participation in the regulatory unitization process in the form of a defensive request for a modification in the drilling units being formed at the initiative of Davis Oil in order to prevent uncompensated drainage of fractions of the land under Steamboat's leases does not constitute tacit consent to the operations.
In the absence of consent, to hold non-operating parties to a compulsory drilling unit personally liable for a proportionate share of unit costs in an unsuccessful venture would be tantamount to placing the less opulent party wholly at the mercy of the better situated party. c.f. Freeman v. Depression Oil Co., supra at 194; McCollam, Legal Relations Among Parties to Compulsory Units, supra at 97-99. The interest of the non-operating co-owner could thereby be entirely destroyed or absorbed by the more fortunate one and financial ruin or forced sacrifice of his property rights would often result. c.f. Freeman v. Depression Oil Co., id.; McCollam, id.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed and the judgment of the trial court dismissing Davis Oil's claims with prejudice is reinstated.
REVERSED.
NOTES
[*] We note that La.R.S. 30:10 has been amended by La.Act 345 of 1984. However, because the amendment did not become effective until after the effective date of the Commissioner's unitization order issued in the present case, we do not address the provisions of Act 345.