# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #032

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **28th day of June, 2024** are as follows:

**BY Griffin, J.:**

2023-CQ-01242    *JAMES SELF; WILMA SELF   VS.   BPX OPERATING COMPANY*

CERTIFIED QUESTION ANSWERED. SEE OPINION.

Weimer, C.J., dissents and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2023-CQ-01242

## JAMES SELF; WILMA SELF

## VS.

## BPX OPERATING COMPANY

*On Certified Question from the United States Court of Appeals for the Fifth Circuit*

**GRIFFIN, J.**

Invoking Louisiana Supreme Court Rule XII,[1] the United States Court of Appeals for the Fifth Circuit certified to this Court the following question of law:

> Does La. C.C. art. 2292 apply to unit operators selling production in accordance with La. R.S. 30:10(A)(3)?

Based on a plain reading of the operative statutes, we find La. C.C. art. 2292 inapplicable.

## FACTS AND PROCEDURAL HISTORY

Certified questions are decided on the facts presented to us by the federal court. *See, e.g., Menard v. Targa Resources*, L.L.C., 23-0246, p. 2 (La. 6/27/23), 366 So.3d 1238, 1240.

James and Wilma Self filed suit as purported representatives of a putative class of plaintiffs who own unleased mineral interests ("unleased mineral owners" or "UMOs") in Louisiana situated within compulsory drilling units formed by the

---

[1] Louisiana Supreme Court Rule XII provides, in relevant part:

> When it appears to … any circuit court of appeal of the United States … that there are involved in any proceedings before it questions or propositions of law of this state which are determinative of said cause independently of any other questions involved in said case and that there are no clear controlling precedents in the decisions of the supreme court of this state, such federal court before rendering a decision may certify such questions or propositions of law of this state to the Supreme Court of Louisiana for rendition of a judgment or opinion concerning such questions or propositions of Louisiana law. This court may, in its discretion, decline to answer the questions certified to it.

Louisiana Office of Conservation and operated by BPX Operating Company ("BPX"). Because the plaintiffs nor the class members made separate arrangements to dispose of their shares of production, the unit operator may sell the shares but, under La. R.S. 30:10(A)(3), must pay the owners a pro rata share of the proceeds within one hundred eighty days of the sale.[2] BPX has been paying the pro rata share of production but has been withholding from that amount the pro rata post-production costs for transporting, gathering, marketing, treating, and compressing produced minerals, as well as amounts related to minimum volume commitments or capacity reservations fees. Plaintiffs alleged that the practice of withholding the post-production costs from their pro rata share of production is improper per se.

BPX sought dismissal of the plaintiffs' claim that it can never deduct post-production costs incurred in the sale of UMOs' pro rata shares of production. The federal district court granted BPX's motion to dismiss, holding that the Louisiana doctrine of *negotiorum gestio*, codified in La. C.C. art. 2292, provides a mechanism for unit operators to be reimbursed for post-production costs not otherwise covered by specific statutes.[3] Plaintiffs appealed.

---

[2] La. R.S. 30:10(A)(3) provides:

> A. When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner as provided in R.S. 30:9(B), the owners may validly agree by separate contract to pool, drill, and produce their interests and to develop their lands as a drilling unit.

> * * *

> (3) If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately sell or otherwise dispose of the share of such production attributable to such tract, and the unit operator sells or otherwise disposes of such unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale or other disposition of production within one hundred eighty days of such sale or other disposition.

Numerous amendments to Title 30 (including La. R.S. 30:10) were made by Act 2024, No. 126, however these amendments merely added provisions for brine extraction.

[3] La. C.C. art. 2292 states: "There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances."

2

The United States Fifth Circuit, finding the law unsettled on this issue, certified the foregoing question of law to this Court which we granted.[4] *Self v. BPX Operating Co.*, 23-1242 (La. 12/5/23), 373 So.3d 712.

## DISCUSSION

The certified question asks whether the doctrine of *negotiorum gestio* applies to unit operators selling product in accordance with La. R.S. 30:10(A)(3). Answering concisely, we agree with the well-reasoned dissent of Judge Dennis that – under the established maxims of statutory interpretation – *negotiorum gestio* does not apply and cannot be a basis for liability as a unit operator is always acting "with authority."

The starting point for the interpretation of a statute is the language of the statute itself. *Menard*, 23-0246, p. 3, 366 So.3d at 1241. When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written – no further interpretation may be made in search of legislative intent. La. C.C. art. 9. Nor shall the letter of the law be disregarded under the pretext of pursuing its spirit. La. R.S. 1:4. Words and phrases shall be construed according to the common and approved usage of the language. La. R.S. 1:3.

The oil and gas conservation law provides a unique quasi-contractual relationship between UMOs and unit operators – this relationship cannot be applied consistently with the doctrine of *negotiorum gestio*. *Self*, 80 F.4th at 641 (Dennis, J., dissenting). As "distinct legal regimes with different requirements and different duties, [the two] are necessarily incompatible." *Self*, 80 F.4th at 637 (Dennis, J., dissenting). *Negotiorum gestio* is a typically civilian institution that establishes "a management of affairs when a person, the manager [or *gestor*], acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner

---

[4] Judge Dennis, a respected former member of the Louisiana Supreme Court, dissented finding certification unwarranted.

3

would approve of the action if made aware of the circumstances." La. C.C. art. 2292; La. C.C. art. 2292 cmt. (a). In contrast, the conservation laws of Title 30 were enacted to prevent waste, avoid the drilling of unnecessary wells, and afford each owner the opportunity to recover its just and equitable share of a common pool. Patrick S. Ottinger, *Demystifying Louisiana Revised Statutes § 30:10*, 83 LA. L. REV. 1221, 1235 (2023); *Peironnet v. Matador Resources*, Co., 12-2292, p. 42 (La. 6/28/13), 144 So.3d 791, 822 (citing La. R.S. 30:4; 30:9 and 30:10 and noting the plenary power of the Commissioner of Conservation to accomplish these stated goals); *Nunez v. Wainoco Oil & Gas Co.*, 488 So.2d 955, 960-62 (La. 1986); *King v. Strohe*, 95-0656, p. 16 (La.App. 3 Cir. 5/8/96), 673 So.2d 1329, 1338 (observing "La. R.S. 30:10(A)(3) was enacted for the benefit of both the unit operator and the unleased interest").

A party is only a *gestor* if his action is taken "without authority." La. C.C. art. 2292. However, a unit operator is statutorily authorized by La. R.S. 30:10(A)(3) to sell a UMO's share of production when the unleased owner has not arranged to dispose of his share. As observed by Judge Dennis, the 1995 revision to Article 2292 replaced the requirement that a *gestor* act "of his own accord" with the requirement that he act "without authority." *Self*, 80 F.4th at 640 (Dennis, J., dissenting). We agree that this revision "make[s] clear that the requirement is not merely voluntariness but an 'absence of authority altogether,' including authority granted by statute." *Id*. (citing Cheryl L. Martin, *Louisiana State Law Institute Proposes Revision of Negotiorum Gestio and Codification of Unjust Enrichment*, 69 TUL. L. REV. 181, 189-90); La. R.S. 24:177(C) ("where the new article or statute is worded differently from the preceding law, the legislature is presumed to have intended to change the law"). Such an interpretation is consistent with the well-settled rule of statutory construction that the more specific statute – the comprehensive scheme established in Title 30 – controls over the more general

4

provision of *negotiorum gestio* codified in La. C.C. art. 2292. *See Burge v. Louisiana*, 10-2229, p. 5 (La. 2/11/11), 54 So.3d 1110, 1113; *Nunez*, 488 So.2d at 963-64 (holding provisions of Title 30 supersede other private property laws "in the interest of conserving the natural resources of the state"); *Amoco Prod. Co. v. Thompson*, 516 So.2d 376, 393 (La.App. 1st Cir. 1987) (oil and gas conservation law is "*sui generis*"). A unit operator who sells an owner's production under the statutory authority of La. R.S. 30:10(A)(3) cannot therefore be a *gestor* under La. C.C. art. 2292 as a *gestor* is one who acts "without authority."[5] *Self*, 80 F.4th at 637 (Dennis, J., dissenting).

## DECREE

We have answered the certified question as set forth in this opinion. Pursuant to Louisiana Supreme Court Rule XII, the judgment rendered by this Court upon the question certified shall be sent by the clerk of this Court under its seal to the United States Court of Appeals for the Fifth Circuit and to the parties.

**CERTIFIED QUESTION ANSWERED**

---

[5] We further agree with Judge Dennis' conclusion the language in *Taylor v. Smith*, 619 So.2d 881, 887-88 (La.App. 3d Cir. 1993), that a unit operator "is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced" was dicta and predated the relevant 1995 amendment to La. C.C. art. 2292.

# SUPREME COURT OF LOUISIANA

## No. 2023-CQ-01242

## JAMES SELF; WILMA SELF

## VS.

## BPX OPERATING COMPANY

*On Certified Question from the*
*United States Court of Appeals for the Fifth Circuit*

**WEIMER**, C.J., dissenting

The question certified by the United States Court of Appeals for the Fifth Circuit concerns *negotiorum gestio*[1]–an ancient Roman institution passed down and retained in Louisiana's Civil Codes since 1808. The presentation of such a question demonstrates the enduring legacy and quality of the time-honored concepts contained in the Civil Code of Louisiana to resolve contemporary conflicts. In invoking certification, the Fifth Circuit recognized "[t]he interplay between Louisiana's oil and gas law and its unique *negotiorum gestio* doctrine presents a complex and novel issue 'peculiarly calling for the exercise of judgment by the [Louisiana] courts.'" **Self v. BPX Operating Co.**, 80 F.4th 632, 637 (5th Cir. 2023)(citing **McKesson v. Doe**, 592 U.S. 1, 5 (2020)). The question this court was asked to resolve is: "Does La. Civ. Code art. 2292 apply to unit operators selling production in accordance with La. R.S. 30:10(A)(3)?" Respectfully, in answering that question, the majority opinion engages

---

[1] "Negotiorum gestor" is a term used to "designate a person who manages the business, the affairs of another." Gérard Cornu, DICTIONARY OF THE CIVIL CODE 392 (Alain Levasseur and Marie-Eugeìnie Laporte-Legeais trans., 2014). The Dictionary of the Civil Code is a collection of translated concepts of civil law defined in Gérard Cornu's Vocabulaire juridique. It was carried out under the scientific leadership of L.S.U. professors Alain Levasseur, chief translator, along with John Randall Trahan, and also Marie-Eugénie Laporte-Legeais, Director of Juriscope. *Id.* at IX.

in a simplistic analysis, failing to provide even a minimal examination or discussion of the doctrine of *negotiorum gestio*–the very issue underlying the necessity of certification. Louisiana Civil Code article 2292, addressing *negotiorum gestio*, states that "there is a management of affairs when ... the manager acts without authority to protect the interests of ... the owner ...." Simply put, the majority opinion holds that because a unit operator is statutorily authorized by La. R.S. 30:10(A)(3) to sell production, the action is not taken "without authority" and thus *negotiorum gestio* cannot apply. However, after undertaking a full examination of the history and purpose of the relevant laws and the doctrine of *negotiorum gestio*, it is clear that the majority's interpretation of Article 2292 is antithetical to the essence of *negotiorum gestio* and fails to recognize the significance of the doctrine, which has always been rooted in altruism. Properly interpreted, "without authority" should focus on the voluntary nature of the act and be understood to mean the action is not taken pursuant to a legal obligation. The fact that a unit operator is statutorily authorized to sell production is not the same as a statutory mandate. For reasons fully explained below, I find that a unit operator who *voluntarily* sells production under La. R.S. 30:10(A)(3) is acting as a *negotiorum gestor* under La. C.C. art. 2292. Concluding the certified question must be answered in the affirmative, I respectfully dissent.

In the early days of the oil and gas industry, an analogy was observed between the ownership of oil or gas and the ownership of water and animals which traverse one's property, thereby leading to adoption of the "rule of capture." **Nunez v. Wainoco Oil & Gas Co.**, 488 So.2d 955, 960 (La. 1986). The rule of capture

2

generally provides that a land owner acquires title to the oil and gas he produces from wells drilled thereon, whether or not the oil or gas has migrated from surrounding properties. 1 WILLIAMS & MEYERS, OIL AND GAS LAW § 204.3 (2023); **Nunez**, 488 So.2d at 960 (internal citation omitted); <u>see also</u> La. R.S. 31:6,[2] 31:7,[3] 31:8,[4] and 31:14.[5] Understandably, adoption of this rule led to "haste, inefficient operations, and immeasurable waste within the ground and above." **Nunez**, 488 So.2d at 960.

> Naturally, surrounding owners usually would not sit idly by while valuable resources drained out from under them; instead, they raced to produce all the oil and gas they could through their own property, often drilling multiple wells to extract resources as quickly as possible .... [T]his drove up production costs, reduced oil and gas market prices, and unnecessarily decimated the environment.

**T D X Energy, L.L.C. v. Chesapeake Operating, Inc.**, 857 F.3d 253, 257 (5th Cir. 2017)(internal citation omitted).

Recognizing the need for more legislative control of the industry, and primarily due to concerns regarding waste, the legislature enacted a comprehensive

---

[2] La. R.S. 31:6 provides: "Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership."

[3] La. R.S. 31:7 provides: "Minerals are reduced to possession when they are under physical control that permits delivery to another."

[4] La. R.S. 31:8 provides: "A landowner may use and enjoy his property in the most unlimited manner for the purpose of discovering and producing minerals, provided it is not prohibited by law. He may reduce to possession and ownership all of the minerals occurring naturally in a liquid or gaseous state that can be obtained by operations on or beneath his land even though his operations may cause their migration from beneath the land of another."

[5] La. R.S. 31:14 provides in relevant part: "A landowner has no right against another who causes drainage of liquid or gaseous minerals from beneath his property if the drainage results from drilling or mining operations on other lands."

conservation statute in 1940 ("The Conservation Act") with respect to the oil and gas industry, giving extensive regulation powers to the Commissioner of Conservation. **Nunez**, 488 So.2d at 960-61; La. R.S. 30:1, *et seq.* One method authorized to prevent an abuse of the rule of capture and wasteful drilling is the statutory power granted to the Commissioner to establish compulsory drilling units and designate unit operators therefor. La. R.S. 30:9; 30:10; **Hunt Oil Co. v. Batchelor**, 93-3144, p. 6 (La. 10/17/94), 644 So.2d 191, 196-97; **Corbello v. Sutton**, 442 So.2d 610, 614 (La. 1983). "The general concept behind the establishment of drilling units is to prevent adjoining landowners or leaseholders from having to drill protective offset wells on their premises by permitting them to share production proportionately to the area of their acreage drained by the unit well." **Davis Oil Co. v. Steamboat Petroleum Corp.**, 583 So.2d 1139, 1142 (La. 1991). "Forced pooling" or "compulsory unitization" converts separate interests within the drilling unit into a common interest relative to the development of the unit and the drilling of the well. **Amoco Production Co. v. Thompson**, 516 So.2d 376, 383 (La. App. 1 Cir. 1987). Unitization works to ensure that each owner within the unit receives an equitable share of production. See La. R.S. 30:9(A); **Amoco Production Co.**, 516 So.2d at 385 (internal citation omitted).

As a result of compulsory drilling units, it was necessary to develop rules allocating costs between the unit operator and non-operating parties who share in production. **Davis Oil Co.**, 583 So.2d at 1142. Under La. R.S. 30:10(A)(2), the costs of development and operation are chargeable to the owners within a unit. The statute

4

was amended in 1984 to add the "Risk Fee Act" which provides a mechanism by which a party who declines to participate in the cost, risk, and expense of drilling a unit well (non-participating owner) will incur a "risk charge" that is paid out of production as a means of compensating the operator for assuming the cost, risk, and expense of that well. See La. R.S. 30:10(A)(2).[6] The Risk Fee Act works to eliminate the problem of owners enjoying a "free ride" at the expense of operators.[7] See **TDX Energy**, **L.L.C.**, 857 F.3d at 258. Unleased mineral owners, such as the plaintiffs, are treated as nonparticipating owners under the Risk Fee Act, but they are exempt from the risk charge. See La. R.S. 30:10(A)(2)(e)(i). Thus, La. R.S. 30:10(A)(2) authorizes the operator to recoup out of production the UMO's pro rata share of costs of "drilling, testing, completing, equipping, and operating the well"–*i.e.*, production costs.

Louisiana R.S. 30:10(A)(2) logically does not address post-production costs. In Louisiana, the production phase of oil and gas operations terminates at the wellhead when the minerals are reduced to possession. **Babin v. First Energy Corp.**, 96-1232, p. 2 (La. App. 1 Cir. 3/27/97), 693 So.2d 813, 815. Expenses incurred after the production has been discovered and delivered to the surface of the earth are "post-production" expenses. **Rives Plantation, L.L.C. v. BPX Properties**

---

[6] This section has been amended several times since its inception.

[7] Under the Risk Fee Act, participating owners pay their allocated share of the costs of drilling, testing, completing, and operating the well up front, and receive their pro rata share of production, if any, from the well at production. See La. R.S. 30:10(A)(2)(a)(i). A nonparticipating owner's share of costs is recouped by the operator out of production, if any, plus a "risk charge," to compensate the operator for the risk assumed in drilling the well. See La. R.S. 30:10(A)(2)(b)(i).

**(N.A.) LP**, 55,301, p. 50 (La. App. 2 Cir. 12/20/23), 376 So.3d 328, 351, <u>writ denied</u>, 24-00109 (La. 3/12/24).[8]  Louisiana R.S. 30:10(A)(2)  concerns responsibility and allocation of costs and risk issues involved in getting a unit well *operational* to production.  Thus, the regulation of costs pursuant to La. R.S. 30:10(A)(2) ceases "at the wellhead."

Louisiana R.S. 30:10(A)(3) does not address costs at all.  Compared to lessees within a unit,[9] a UMO may find it challenging to take its share of production in kind and directly market that production.  Louisiana R.S. 30:10(A)(3) confirms that UMOs retain the right to make arrangements to sell their share of production, however, the statute also allows the unit operator to market such production *if* the UMO fails to make its own arrangements, even if the operator has no contractual relationship with the mineral interest owners:

> (3) If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately sell or otherwise dispose of the share of such production attributable to such tract, and the unit operator sells or otherwise disposes of such unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale or other disposition of production within one hundred eighty days of such sale or other disposition.

La. R.S. 30:10(A)(3).  The trade-off for this statutory authorization is that it creates an obligation in which the unit operator is required to pay the UMO its pro-rata share

---

[8]  Such costs generally include those related to taxes, transportation, processing, dehydration, treating, compression, and gathering. **Rives Plantation, L.L.C.**, 55,301 at 50-51, 376 So.3d at 351.

[9]  A mineral lessee is under a duty to exercise reasonable diligence to secure a market for minerals that have been produced or are capable of being produced in paying quantities. La. R.S. 31:122 (comment).

of the proceeds (in contrast to in kind production) of the sale within 180 days of such sale.[10] In this sense, the statute affords a greater protection to UMOs than is enjoyed by mineral lessees. **King v. Strohe**, 95-656, p. 16 (La. App. 3 Cir. 5/8/96), 673 So.2d 1329, 1338. As explained in **King**,

> La. R.S. 30:10(A)(3) was enacted for the benefit of both the unit operator and the unleased interest. It protects the unleased interests and avoids undue delays in the sale of production. Leased interests are usually entitled to only an in kind share of production, which they then market. It is then the lessee's duty to distribute the proceeds under its contract with its lessor. When there is no lessee, the mineral interest owner must deal directly with the unit operator, with whom he has no contractual relationship.

**King**, 95-656 at 17, 673 So.2d at 1338. Thus, La. R.S. 30:10(A)(3) specifically clarified the right of the unit operator to sell the UMO's share of production if the UMO chooses not to do so. See **Taylor v. Woodpecker Corp.**, 562 So.2d 888, 891 (La. 1990)("Prior to the enactment of LSA-R.S. 30:10(A)(3), a unit operator's implied authority was at best uncertain with respect to selling production on behalf of owners who had not made separate arrangements to dispose of their shares .... Enactment of the statute at least partially solved this problem by allowing unit operators to sell production on behalf of unleased interest owners."). Additionally, this statutory provision clarified that UMOs are entitled to payment of cash proceeds instead of in-kind production typically received by lessees, and further dictated the date by which the operator must pay the UMO its share of proceeds. See **Hunt Oil Co.**, 93-3144 at 11, 644 So.2d at 200 n.16; see also **King**, 95-656 at 17, 673 So.2d at 1338. The

---

[10] This court has recognized that a UMO has a cause of action against the unit operator to recover the value of its share of production. **Taylor v. Woodpecker Corp.**, 562 So.2d 888, 892 (La. 1990).

7

statute does not expressly preclude deduction of post-production costs from the sale proceeds.

Because La. R.S. 30:10(A)(3) is silent as to post-production costs, there is no inherent prohibition against a unit operator looking to the Civil Code for an available remedy or mechanism by which to recoup these expenses. This court has long recognized that the conservation laws are not considered in a vacuum, and must be analyzed in light of the Civil Code and prior jurisprudence:

> In construing the provision of [the conservation statute], we must do so in the light of the applicable codal articles, within the framework of previous jurisprudence and pursuant to a general pattern, being not unmindful of the comprehensive scope, elasticity and flexibility of the civil law, so as to formulate rules which will apply in any case at present foreseeable in the development of our mineral law.

**Childs v. Washington**, 87 So.2d 111, 114 (La. 1956); see also **Trunkline Gas Co. v. Steen**, 187 So.2d 720, 727 (La. 1966); *cf* **Nunez**, 488 So.2d at 964 (finding Title 30 of the Conservation Code superceded in part the general concept of ownership in Civil Code article 490 because the provisions conflicted). Civilian methodology recognizes the Civil Code as "central" and drafted with "organic harmony," requiring us to apply its provisions by deductive reasoning and analogy to a variety of situations "not precisely within its scope." Albert Tate, Jr., Civilian Methodology, 44 Tul. L. Rev. 673, 674-75 (quoting from *The Louisiana Blueprint* by Professor Clarence Morrow (Morrow, Louisiana Blueprint: Civilian Codification and Legal Method for State and Nation, 17 Tul. L. Rev. 351)).

In this case, the unit operator seeks to employ La. C.C. art. 2297, which would allow the operator to be reimbursed for its "necessary and useful expenses," if the

8

operator is acting as a "manager" or "*gestor*" under the doctrine of *negotiorum gestio*.[11] Where two statutes address the same subject matter, the statutes should be harmonized if possible; but if there is a conflict, the statute specifically directed to the matter at issue must prevail. **Davis v. State through Louisiana Racing Comm'n**, 20-01020, p. 4 (La. 5/13/21), 320 So.3d 1028, 1032; see also La. C.C. art. 13 ("Laws on the same subject matter must be interpreted in reference to each other."). However, because La. R.S. 30:10(A)(3) is silent as to post-production costs, there is no conflict between that specific provision in the Conservation Code and La. C.C. art. 2297, which provides for reimbursement of the manager's necessary and useful expenses in the context of *negotiorum gestio*. Silence alone is insufficient to create a conflict. Thus, these provisions must be read in conformity with each other. See **Guitreau v. Kucharchuk**, 99-2570, p. 5 (La. 5/16/00), 763 So.2d 575, 579 (reading a specific provision in the Medical Malpractice Act in conformity with a general Civil Code article).

Application of La. C.C. art. 2297 is dependent on whether the doctrine of *negotiorum gestio* is properly applied when a unit operator sells a UMO's share of production pursuant to La. R.S. 30:10(A)(3). The relevant jurisprudence has been consistent. This court has described the relationship created by La. R.S. 30:10(A)(3) between a unit operator and a UMO as quasi-contractual. **Wells v. Zadeck**, 11-1232, p. 6 (La. 3/30/12), 89 So.3d 1145, 1149. In doing so, this court, without further

---

[11] La. C.C. art. 2297 states: "The owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses."

9

analysis, cited to **Taylor v. Smith**, 619 So.2d 881 (La. App. 3 Cir. 1993), and **King v. Strohe**, *supra* (which itself cited to **Taylor v. Smith**). In **Taylor v. Smith**, the court specifically defined the relationship as one sounding in *negotiorum gestio*, holding a UMO has "a cause of action in quasi-contract under LSA-C.C. art. 2292, *et seq*., insofar as the operator, in selling the owner's proportionate share of the oil produced, is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced." **Taylor**, 619 So.2d at 887. Following **Taylor v. Smith**, the courts of appeal have continued to hold that a unit operator selling a UMO's share of production under La. R.S. 30:10(A)(3) is acting as a *negotiorum gestor*. See **Taylor v. David New Operating Co., Inc**., 619 So.2d 1251, 1255 (La. App. 3 Cir. 1993); **Taylor v. Woodpecker Corp**., 93-0781 (La. App. 1 Cir. 3/11/94), 633 So.2d 1308, 1313.[12] This court's reliance on **Taylor v. Smith** in the **Wells** decision implied that the quasi-contractual relationship created by La. R.S. 30:10(A)(3) is one of *negotiorum gestio*, but it was not necessary to our holding in **Wells** to perform the relevant analysis or explicitly so hold.[13] But any uncertainty caused by the absence of analysis, or direct reference to *negotiorum gestio* in that opinion, should be resolved by specifically holding the doctrine of *negotiorum gestio* applies to the

---

[12] These cases involved the same plaintiffs and same well as **Taylor v. Smith**, 619 So.2d 881 (La. App. 3 Cir. 1993).

[13] **Wells** concerned whether *contra non valentem* applied to suspend the prescriptive period applicable to an action by an unleased mineral lease owner against the unit operator for failure to pay the owner its share of proceeds for production. There was no dispute in the case that the claim was quasi-contractual in nature, subject to a 10-year prescriptive period under La. C.C. art. 3499. **Wells**, 11-1232 at 1, 3, 89 So.3d at 1146-47.

quasi-contractual relationship between the unit operator and a UMO under La. R.S. 30:10(A)(3).[14]

The doctrine of *negotiorum gestio* (management of the affairs of another) is a civil law institution dating back to Roman times, and preserved in our Civil Code. ALAIN A. LEVASSEUR, LOUISIANA LAW OF UNJUST ENRICHMENT IN QUASI-CONTRACTS 57-58 (1991). It has been generally defined as the "unrequested intervention of a person, the 'manager,' who acts usefully and appropriately to protect the interests of another person, the 'owner' of the affair, usually in situations of necessity." Nikolaos A. Davrados, Restating the Civil Law of Quasi-Contract: *Negotiorum Gestio* and Unjust Enrichment, 15 J. CIV. L. STUD. 1, 35-36 (2023). Professor Levasseur explained the doctrine is rooted in altruism and ethics:

> Altruism, the duty or need to help and assist others, appears to be the true foundation of the rights and obligations flowing to the parties bound under *negotiorum gestio* .... [T]he rights and obligations of both the gestor and principal are tailored or fashioned both by the altruistic intent of the gestor and on account of the real need that exists on the part of the principal, although the gestor does not wish to go as far as suffering a loss himself ....

> This moral foundation of *negotiorum gestio* explains to a large extent why the Louisiana Civil Code provisions are so few, and so broad, in their regulation of this institution. It is somewhat difficult to legislate morality. The jurisprudence, on the other hand, must contend with daily practical issues which need to be answered against the general background of statutory law. The courts will have to proceed by way of deductive reasoning, from the existing general principles of law down

---

[14] The lack of clarity regarding whether the unit operator who sells a UMO's share of production under La. R.S. 30:10(A)(3) does so as an unauthorized *negotiorum gestor* under the provisions of La. C.C. art. 2292 was recently recognized by Professor Davrados. Nikolaos A. Davrados, Restating the Civil Law of Quasi-Contract: *Negotiorum Gestio* and Unjust Enrichment, 15 J. CIV. L. STUD. 1, 55-56 n.258 (2023).

11

to the formation of specific rules so as to allow *negotiorum gestio* to
fulfill its human, moral, and legal meaning.

LEVASSEUR, *supra*, at 68-69. Professor Robert Pascal has also expounded on the

unique voluntary nature of *negotiorum gestio*:

> [T]he civil law, from its earliest Roman days, so much respected and
> valued voluntary assistance to another that it would indemnify the actor
> his expenses if he proved his intervention reasonable and his
> performance diligent, whether or not it had resulted in actual benefit to
> the other person. No other institution of law gives greater recognition
> to the desirability of encouraging unsolicited worthwhile action on
> behalf of one's fellow man. It is to the glory of the civil law that it
> continues to preserve and respect this institution.

Robert A. Pascal, Louisiana Civil Law and Its Study, 60 La. L. Rev. 1, 6 (1999).

"*Negotiorum gestio* is not merely a remedy in restitution. It is a code of behavior, an

expression of the principle of good faith and altruism." Davrados, *supra*, at 43.

The quasi-contractual obligation of *negotiorum gestio* is specifically

incorporated into Louisiana Civil Code article 1757, which provides the sources of

obligations:

> Obligations arise from contracts and other declarations of will.
> They also arise directly from the law, regardless of a declaration of will,
> in instances such as wrongful acts, **the management of the affairs of
> another**, unjust enrichment and other acts or facts. [Emphasis added.]

Although the term "quasi-contract" no longer appears in the Civil Code, use of that

term continues. Davrados, *supra*, at 7. It is understood that a quasi-contract is the

source of an obligation that is created without the concurrence of wills–without the

agreement of parties that is necessary to form a contract. 5 SAUL LITVINOFF &

RONALD J. SCALISE JR., LOUISIANA CIVIL LAW TREATISE: LAW OF OBLIGATIONS

§ 1.6 (2d ed.). *Negotiorum gestio* is currently governed by Civil Code articles 2292

12

through 2297, falling under Title V of the Civil Code–Obligations Arising Without Agreement. Article 2292 defines *negotiorum gestio* as follows:

> There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.

La. C.C. art. 2292. In this case, the primary source of dispute regarding application of *negotiorum gestio* is the requirement that the manager act "without authority."

As pointed out by the majority (citing Judge Dennis' dissent to the certification), the Civil Code articles governing *negotiorum gestio* were revised in 1995. Prior to 1995, *negotiorum gestio* was addressed in Civil Code article 2295. That provision stated, in relevant part:

> When a man undertakes, ***of his own accord***, to manage the affairs of another, whether the owner be acquainted with the undertaking or ignorant of it, the person assuming the agency contracts the tacit engagement to continue it and to complete it, until the owner shall be in a condition to attend to it himself; he assumes also the payment of the expenses attending the business. [Emphasis added.]

La. C.C. art. 2295 (1870). The majority opinion, again citing Judge Dennis'dissent, concludes the change in language from "of his own accord" in former Article 2295, to "without authority" in current Article 2292, makes "clear that the requirement is not merely voluntariness but 'an absence of authority altogether,' including authority granted by statute." **Self v. BPX Operating Co.**, 23-01242 (La. 06/–/24), slip op. p. 4 (citing **Self**, 80 F.4th at 640 (Dennis, J., dissenting)). Thus, the majority concludes because the unit operator has specific authority to sell a UMO's share of production

under La. R.S. 30:10(A)(3), the unit operator cannot be a gestor under La. C.C. art. 2292.[15] Respectfully, I do not agree with this interpretation.

Addressing rules of statutory interpretation, this court has explained:

> The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.
>
> The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. However, when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.

**Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.**, 10-0193, pp. 9-10 (La. 1/19/11), 56 So.3d 181, 187-88 (quoting **M.J. Farms, Ltd. v. Exxon Mobil Corp.**, 07-2371, p. 13 (La.7/1/08), 998 So.2d 16, 27); see also La. C.C. art. 10 ("When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law."). To

---

[15] Interestingly, the only source cited by Judge Dennis to support the proposition that the change in language was substantive is a student law review comment. See Cheryl L. Martin, Louisiana State Law Institute Proposes Revision of *Negotiorum Gestio* and Codification of Unjust Enrichment, 69 Tul. L. Rev. 181 (1994). The comment suggests the elimination of the phrase "of his own accord" and use of the phrase "without authority" "to a certain extent [eliminates] the voluntary connotations associated with [the doctrine]." *Id*. at 189. No authority is provided to demonstrate the legislature intended a substantive change to "eliminate the voluntary connotation" of *negotiorum gestio*.

14

the extent the phrase "without authority" in La. C.C. art. 2292 is susceptible of different meanings, by applying the above principles I conclude the reference to "without authority" in La. C.C. art. 2292 does not encompass a permissive authority to act, such as the statutory authority in La. R.S. 30:10(A)(3), but is more appropriately interpreted to mean a lack of authority *from the owner* whose interests are being managed and an absence of a legal duty to act.

Revisions to the Civil Code articles relating to *negotiorum gestio* were included in a broader partial revision of Book III, Title V of the Louisiana Civil Code of 1870 which was titled "Of Quasi Contracts, and of Offenses and Quasi-Offenses." This section was revised and reorganized into current Title V, entitled "Obligations Arising Without Agreement." "Management of Affairs" (*negotiorum gestio*) is included within Title V, along with "Enrichment Without Cause" and "Of Offenses and Quasi Offenses." See *Expose des Motifs*, La. C.C. arts. 2292-2305 (rev. 1995), 1995 La. Acts 1041. Prior to the revision, La. C.C. art. 2293 (1870) broadly defined quasi-contract as "the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties." Article 2294 (1870) more particularly defined the types of quasi-contracts: "All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two principal kinds which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due." *Negotiorum gestio* was additionally defined in Article 2295 (1870) (quoted *supra*). By broadly defining

15

quasi-contracts, the pre-revision articles suggested the possible existence of innominate types of quasi-contracts (other than *negotiorum gestio* and payment of a thing not due). The revision corrected course, and properly "[a]bandoned this broad notion of quasi-contract, and instead focused on delineating two distinct institutions: *negotiorum gestio* and unjust enrichment, which, in turn, comprises two separate actions–payment of a thing not due ... and enrichment without cause." Davrados, *supra*, at 7. As stated by Professor Davrados, "the true meaning of a 'quasi-contractual' obligation is an obligation stemming from *negotiorum gestio* or unjust enrichment, and nothing more." ***Id***.

Additionally, under the pre-revision articles, the definitional requirements for *negotiorum gestio* were derived from both the general articles addressing quasi-contracts, and Article 2295 (1870), specifically addressing *negotiorum gestio*. After the revision, these requirements were essentially collapsed into Article 2292. There is no indication the legislature intended a significant substantive change in the *negotiorum gestio* requirements.[16] Indeed, comment (b) to Article 2992 states "[t]his Article accords with Article 2295 of the Louisiana Civil Code of 1870." The *Expose des Motifs* relative to revised Article 2922 further explains:

> Article 2295(1) of the Louisiana Civil Code of 1870 combines a definition of negotiorum gestio with certain substantive provisions. Article 2292 does the same. However, certain expressions found in Civil Code Article 2295(1) (1870) have not been reproduced. The words "of his own accord" have not been reproduced because the idea is implicit in the notion of management without authority.

---

[16] The revision also abrogated several former Civil Code articles (Articles 2292, 2293 and 2294 of the Code of 1870) as unnecessary because they were considered purely didactic. See *Expose des Motifs*, La. C.C. arts. 2292-2305 (rev. 1995), 1995 La. Acts 1041.

*Expose des Motifs*, La. C.C. arts. 2292-2305 (rev. 1995), 1995 La. Acts 1041. Thus, I am not persuaded the revision was intended to part from the long-held understanding that *negotiorum gestio* involves a voluntary act by one who is under no obligation to take action by law or contract.[17]

Differentiating the doctrine from mandate elucidates that the distinguishing feature of *negotiorum gestio* is the voluntary nature of the act. Planiol made clear "there is 'gestion d'affaires' in every case where a person accomplishes a juridical act in the interest of another without having been charged to do so. The 'gestion d'affaires' therefore differs from mandate in that it is undertaken spontaneously by him who accomplishes it, while the mandate is a management of affairs undertaken by virtue of a contract, or by virtue of the law." 2 MARCEL PLANIOL, TREATISE ON THE CIVIL LAW, § 2273 (12th ed. 1939). Likewise,

> The management of another's affairs is the act of a person, who, without having been charged, concerns himself with the affairs of another person, the master of the affair. In certain respects the management of another's affairs resembles the mandate but it is noticeably different; it does not rest on an accord of wills. If the master consents, the result is a mandate.

J. DENSON SMITH, LOUISIANA AND COMPARATIVE MATERIALS ON CONVENTIONAL OBLIGATIONS 417 (4th ed. 1973). Louisiana jurisprudence also focuses on the distinction between *negotiorum gestio* and mandate, recognizing

---

[17] I recognize statements contained in the official comments are not part of the statute, and are not binding on this court, but the court does not discount these comments entirely as providing some aid in interpreting legislative intent. See **Terrebonne Par. Sch. Bd. v. Castex Energy, Inc.**, 04-0968, p. 11 (La. 1/19/05), 893 So.2d 789, 797. My review of the revised articles, as well as consideration of the doctrine of *negotiorum gestio* as a whole, support my interpretation of "without authority" as used in La. C.C. art. 2922.

application of *negotiorum gestio* is dependent on whether the manager is bound by contract or law to perform the acts of management. See, e.g., **Kirkpatrick v. Young**, 456 So. 2d 622, 624-25 (La. 1984) (no cause of action in *negotiorum gestio* where all actions were undertaken pursuant to an employment contract); **3525 Prytania St. Condo. Ass'n, Inc. v. Prytania Inv. Properties, LLC**, 23-0077, pp. 5-6 (La. App. 4 Cir. 12/13/23) (unpublished) ("[T]he person who manages the affairs may only use *negotiorum gestio* as an avenue to recovery if the manager had no duty to perform the acts of management.); **Lee v. Lee**, 03-1483, pp. 5-6 (La. App. 3 Cir. 3/17/04), 868 So.2d 316, 319 ("Mandate is 'a contact by which a person, the principal, confers authority on another person to transact one of more affairs for the principal.' *Negotiorum gestio*, or management of affairs, is 'when a person, the manager, acts without authority to protect the interest of another, the owner ....'"); **Coastal Environmental Specialists, Inc. v. Chem-Lig Intern., Inc**., 00-1936, p. 13 (La. App. 1 Cir. 11/9/01), 818 So.2d 12, 21 ("Coastal was acting under the authority vested in it by Chem-Lig pursuant to its contract .... The management was not 'purely voluntary,' but rather, was pursuant to its contract with Chem-Lig."); **Tyler v. Haynes**, 99-1921, p. 7 (La. App. 3 Cir. 5/3/00), 760 So.2d 559, 563 ("Article 2292 provides an individual ... to manage the affairs and to protect the interest of another ... (the owner), **without the authority of the owner**, in the reasonable belief that the owner would approve of the action if he were made aware of the circumstances.")(emphasis in original); **Kilpatrick v. Kilpatrick**, 27,241, p. 9 (La.

18

App. 2 Cir. 8/23/95), 660 So.2d 182, 187 ("Management of another's affairs pursuant to a legal duty does not give rise to an action under *negotiorum gestio*.").

*Negotiorum gestio* presupposes a voluntary act of the manager and it imposes reciprocal obligations to both parties. Davrados, *supra*, at 42. Professor Levasseur defined "voluntary" as follows:

> [C]onsidering that the essence of the legal distinction between a contract and a quasi-contract is the existence of consent ... in a contract and the lack thereof in a quasi-contract, the word "voluntary" in a quasi-contract can only mean that the act performed, and from which obligations may arise, cannot have been undertaken as a result of some legal obligation. The source of the quasi-contractual obligation lies in the *free* will of man to act outside any legal constraint.

Levasseur, *supra*, at 34. The fact that an action is *permitted* under the law does impose an obligation which negates the voluntary nature of the act. The majority's interpretation of Article 2292 to proscribe application of *negotiorum gestio* simply because the unit operator's action, although completely voluntary, is permitted under La. R.S. 30:10(A)(3), is contrary to the underlying altruistic purpose and long understood meaning of the doctrine. Rather, interpreting "without authority" to mean the action is not taken pursuant to a legal obligation best conforms with the underlying altruistic purpose of *negotiorum gestio* and properly focuses on the voluntary nature of the act.

The requirements of *negotiorum gestio* are satisfied when a unit operator sells a UMO's share of production pursuant to La. R.S. 30:10(A)(3). As explained by legal scholars, the management must be spontaneous, useful and licit. See ALAIN A. LEVASSEUR & NIKOLAOS A. DAVRADOS, LOUISIANA LAW OF CONTRACTS AND

19

QUASI-CONTRACTS, A PRECIS, p. 189 (2024). The spontaneous nature of the management focuses on whether it is purely voluntary. Davrados, *supra*, at 55. As established in detail above, the unit operator is acting "without authority" when it sells a UMO's share of production because the operator is under no legal or contractual obligation to do so. Under La. R.S. 30:10(A)(3), it is clear that a UMO can choose to take production in kind and make arrangements to market and sell its share of production. However, should the UMO choose not do so, the unit operator is *allowed*, but not required, to sell that production. Thus, the act of management by the operator in selling the UMO's share of production is purely voluntary and, thus, "spontaneous."

Additionally, the act of management must be in the interest "of another." The purpose of the law of *negotiorum gestio* "is to balance two conflicting legal principles: the principle of good faith or altruism and the principle of individualism, which disfavors interference in the affairs of others." LEVASSEUR & DAVRADOS, *supra*, at 187. Thus, interference is generally not allowed unless the management is useful and protects the interest of the owner. Davrados, *supra*, at 60. But it is not necessary that the management be solely in the interest of the owner. If the manager has some interest in the affair managed, it is sufficient that the manager have their common interest in mind when managing the affair. See LEVASSEUR & DAVRADOS, *supra*, at 188-89; see also LEVASSEUR, *supra*, at 74. Clearly, production is futile without distribution of the product. See **Culpepper v. EOG Res., Inc.**, 47,154, p. 4

20

(La. App. 2 Cir. 5/16/12), 92 So.3d 1141, 1144.[18]  When an operator chooses to sell a UMO's share of production, the act is useful in that it satisfies the absolute need to do something with the product once removal from the well is accomplished.  The act of selling the production necessarily benefits the UMO, who does not have to arrange for processing, transporting, or marketing of its share of the product, and is also entitled to a share of proceeds in cash.  If the sale also benefits the operator, that fact does not prevent application of *negotiorum gestio* principles.

Finally, the management must be licit–not unlawful or against public policy. See LEVASSEUR & DAVRADOS, *supra*, at 188-89.  Here, the operator's act is legally permitted by La. R.S. 30:10(A)(3).  Thus, it is necessarily licit.

The conditions which define the legal parameters of *negotiorum gestio* are meant both to encourage a *gestor* to manage the affairs of another and to protect the owner against irresponsible or negligent acts of the management.  LEVASSEUR, *supra*, at 69-70.  Notably, any concern regarding the unit operator improperly benefitting from the sale is adequately addressed by the Civil Code.  The manager is only entitled to reimbursement of expenses that are "necessary and useful." La. C.C. art. 2297.  Moreover, the manager is required to "exercise the care of a prudent administrator and is answerable for any loss that result from his failure to do so." La. C.C. art. 2295.  Thus, if the unit operator causes damage, incurs unnecessary

---

[18]  This case involves production of natural gas, for which there is no market "at the wellhead."  For this commodity to have value, it must be processed, transported, and marketed for sale.  Action must be taken after the gas is produced from the well.  These post-production services provided to the UMO have value. See, e.g., **Culpepper**, 47,154 at 3-4, 92 So.3d at 1143-44; **Freeland v. Sun Oil Co.**, 277 F.2d 154, 159 (5th Cir. 1960).

expenses, or otherwise fails to act as a "prudent administrator," the Civil Code provides the UMO a cause of action.

For more than two centuries, the doctrine of *negotiorum gestio* has been retained in the Louisiana Civil Code, and this court should continue to recognize its legal and societal significance.[19]  As noted by Professor Pascal, the focus of the doctrine has always been on the encouragement of "unsolicited and unobligated

---

[19]  In writing regarding the Civil Codes of Louisiana, scholar Professor A.N. Yiannopoulos expressed:

> The cultural influence of the Louisiana Civil Code on the common law of sister states and on federal law has not been systematically studied, but scattered information suggests that the influence is real and significant.  Mitchell Franklin wrote in 1932:
>
>> The Civil Code of Louisiana is the most important contribution of Louisiana to an American culture.  It possibly is the most important accomplishment in the history of American law in the sense of the relation it bears to the future direction of American law ... It is a rather grim commentary on our historians that the significance of the Louisiana Civil Code has been completely overlooked ... As a cultural document, the Civil Code has its own merit.  It is beautifully written, so carries the best tradition of civilian aesthetics.
>> . . . .
>
> The redactors of the Civil Code have produced a text that has proved both functional and durable.  As a product of its era, the Louisiana Civil Code has been justly considered to be an achievement of juridical craftsmanship and has been hailed as:
>
>> [t]he most precious heritage which we have received from our ancestors ... the filtered residuum, strained and expressed from the accumulated wisdom and experience of large bodies of human race, stretching over vast tracts of time, amongst peoples of various stocks and living under differing conditions and environments, illuminated by the genius of Paul, Ulpian and Papinian, of Crotius Bynkershoeck and Puffendorff, of Dumoulin, Domat and Pothier, purged from all impurities of caste, privilege and monopoly, and permeated and saturated throughout by the divine spirit of Justice, Liberty, and Equality.

1 A.N. YIANNOPOULOS, LOUISIANA CIVIL CODE: THE CIVIL CODES OF LOUISIANA, pp. LVIII-LIX (internal citations omitted).

22

cooperation," and its recognition in the Civil Code "implies a recognition of a human society that is essentially ontological rather than conventional, one in which each person is a part of the whole rather than an individual in voluntary association with the others." Robert A. Pascal, <u>Sources of Civil Order According to the Louisiana Civil Code</u>, 54 Tul. L. Rev. 916, 938 (1979-1980). The facts of this case demonstrate how this ancient doctrine maintains relevance in a modern world. Applying the doctrine in the context of La. R.S. 30:10(A)(3) would be consistent with the legislative desire to prevent "free riders" and consistent with our moral maxim that one should not obtain a windfall at the expense of another. Moreover, it is logical that parties in a compulsory drilling unit who reap the benefits of a successful operation also share in the expenses. Forced pooling is intended to ensure that each owner within the unit–including the unit operator–receives their equitable share of production proceeds. If the operator is forced to bear the UMO's share of post-production expenses, the operator is deprived of its equitable share. If a UMO assumes responsibility to market and sell its share of production, the UMO would necessarily bear its own post-production expenses. There is no justification to relieve a UMO of responsibility for these costs when the UMO takes no action and its share of production is voluntarily sold by the unit operator.

## CONCLUSION

Later this year, we celebrate the 200th Anniversary of the Louisiana Civil Code of 1824. Distilling the comments of the esteemed scholars relied upon, the Civil Code has proven to be both functional and durable. Yiannopoulos, *supra*, at LIX.

23

The Civil Code has an organic harmony and contains within itself a social and legal point of view. Tate, *supra*, at 675. The incorporation of the institution of *negotiorum gestio* into the Civil Code epitomizes the valuation placed on voluntary assistance to another in the civil law. Pascal, *supra*, at 6. "No other institution of law gives greater recognition to the desirability of encouraging unsolicited worthwhile action on behalf of one's fellow man." ***Id***. The glory of the civil law is its continued preservation and respect for the concepts embodied in the law of *negotiorum gestio*. ***Id***. More than simply a remedy in restitution, *negotiorum gestio* is a code of behavior and an expression of the principles of good faith and altruism. Davrados, *supra*, at 43. The application of *negotiorum gestio* in this case balances the rights, duties, and responsibilities of the unit operator and the UMO based on an ancient legal concept which serves contemporary needs, and reflects the functional durability of the Louisiana Civil Code.

Finding *negotiorum gestio* applicable in the context of this case, I respectfully dissent.[20]

---

[20] Although the majority holds *negotiorum gestio* does not apply in this case, I point out this does not resolve the underlying issue of whether the operator is entitled to reimbursement of its post-production costs. The operator has asserted alternative legal bases of recovery, such as enrichment without cause. Because I find *negotiorum gestio* applicable to resolve the ultimate issue, it is not necessary to address the alternative arguments in dissent.